FILED
06-01-2018
Clerk of Circuit Court
Ashland County, WI
2018CV000080

STATE OF WISCONSIN         CIRCUIT COURT         ASHLAND COUNTY

CLARENCE HOULE III

AND

TAMMY HOULE

            Plaintiffs,

   vs.

Town of Sanborn, Wisconsin,

            Defendant.

Case No. _____

Classification:  30405 - Other - Real Estate

Honorable Robert E
Eaton
Branch 1

---

## SUMMONS

---

To each person named above as a Defendant:

     You are hereby notified that the Plaintiffs above named have filed a lawsuit or other legal action against you. The Complaint, which is attached, states the nature and basis of the legal action.

     Within twenty (20) days of receiving this Summons, you must respond with a written Answer, as that term is used in Chapter 802 of the Wisconsin Statutes, to the Complaint. The Court may reject or disregard an Answer that does not follow the requirements of the Statutes. The Answer must be sent or delivered to the Court, whose address is: Ashland County Courthouse, 201 Main Street W, Ashland, WI 54806, and to Dorsey & Whitney LLP, Suite 1500, 50 South Sixth Street, Minneapolis, MN 55402-1498.

     You may have an attorney help or represent you.

     If you do not provide a proper Answer within twenty (20) days, the Court may grant judgment against you for the award of money or other legal action requested in the Complaint, and you may lose your right to object to anything that is or may be incorrect in the Complaint. A judgment may be enforced as provided by law. A judgment awarding money may become a lien



EXHIBIT
A
tabbies

against any real estate you own now or in the future, and may also be enforced by garnishment or seizure of property.

Dated this 1st day of June, 2018.

P.O. ADDRESS:

Suite 1500, 50 South Sixth Street
Minneapolis, MN 55402-1498
(612) 340-2600

DORSEY & WHITNEY LLP
*Attorney for Plaintiffs*

By: <u>Electronically signed by Skip Durocher</u>
    Skip Durocher (SBN 1018814)

2

STATE OF WISCONSIN      CIRCUIT COURT      ASHLAND COUNTY

| | |
|---|---|
| Clarence Houle III | Case No. _____ |
| and | Classification: 30405 - Other - Real Estate |
| Tammy Houle, | |
| Plaintiffs, | |
| vs. | |
| Town of Sanborn, Wisconsin, | |
| Defendant. | |

## COMPLAINT

Plaintiffs Clarence Houle III and Tammy Houle (collectively, "*Plaintiffs*") bring this action for recovery of unlawful taxes against the Town of Sanborn, Wisconsin ("*Defendant*") as follows:

## INTRODUCTION

1.    Plaintiffs bring this suit pursuant to Wis. Stat. § 74.35(3)(d) to recover taxes wrongfully assessed against it by Defendant. Plaintiffs are enrolled members of the Bad River Band of Lake Superior Chippewa Indians Tribe (the "Tribe"), a federally recognized American Indian tribe, and are exempt from state and local property taxes as described herein.

## PARTIES

2.    Plaintiffs are enrolled members of the Tribe, a federally recognized American Indian tribe.

3.    Plaintiffs own real property in fee simple within the Town of Sanborn, which is located in Ashland County, Wisconsin.

4.    Defendant is a municipal organization located in Ashland County, Wisconsin. Certain real property owned by Plaintiffs, property that is the subject of this action, lies within the geographical borders of Defendant.

4839-4722-0071\1

## JURISDICTION AND VENUE

5.     This Court has personal jurisdiction over Defendant because Defendant is a Wisconsin town in Ashland County, Wisconsin.

6.     Venue is proper in this Court under Wis. Stat. §§ 801.50 and 74.35 because Ashland County is the county in which this claim arose, it is the county where real property, which is the subject of this claim, is situated, it is the county where Defendant resides or does substantial business, and it is the county containing the taxation district that denied Plaintiffs' claim under Wis. Stat. § 74.35. Defendant denied Plaintiffs' claim for recovery of unlawful property taxes under Wis. Stat. § 74.35.

## FACTUAL BACKGROUND

7.     Plaintiffs are enrolled members of the Tribe. The Tribe is a successor in interest to the La Pointe Band of Lake Superior Chippewa, a signatory band to the Treaty with the Chippewa at La Pointe, September 30, 1854, 10 Stat. 1109 (the "*1854 Treaty*") between the President of the United States and the Chippewa Indians of Lake Superior and Mississippi.

8.     Article 2, clause 2 of the 1854 Treaty establishes a reservation for the La Pointe Band of Lake Superior Chippewa that is now the reservation of the Tribe (the "*Reservation*").

9.     Plaintiffs own real property in fee simple within the Reservation in the Town of Sanborn.

10.     Plaintiffs timely paid or intend to timely pay under protest the following tax assessed with respect to real property in fee simple that Plaintiff own within the Reservation:

| Parcel Number: | Type of Tax: |
|---|---|
| 022-01600-0300 | 2015, 2016, 2017 real property tax |

Where available, proof of payment is attached as Exhibit A.

4

11.     The above-listed property is within the boundaries of the Reservation and is exempt under federal law from taxation pursuant to the 1854 Treaty.  Because the above-listed property is exempt from taxation under federal law, imposition of property tax with respect to the property was a palpable error under Wis. Stat. § 74.33(1)(c).

12.     Under the 1854 Treaty, the Chippewa Indians ceded to the United States a substantial amount of land in exchange for the United States setting aside permanent reservations for the various bands of Lake Superior and Mississippi Chippewa.  Article 11 of the 1854 Treaty provides that "[T]he Indians shall not be required to remove from the homes hereby set apart for them."

13.     The 1854 Treaty's prohibition against involuntary removal of tribal members from their reservations disallows any involuntary alienation of real property owned by the tribe or tribal members within the Reservation, including the sale of real property in fulfillment of a tax judgment.  Because the 1854 Treaty prohibits the involuntary state alienation of real property owned by the tribe or tribal members within the Reservation, it prohibits the state taxation of such real property within the Reservation.

14.     No provision of the 1854 Treaty otherwise allows for the taxation of real property within the Reservation owned by the Tribe or its members.  No subsequent treaty, statute, or executive order has authorized the imposition of state taxes on real property within the Reservation owned by the Tribe or its members.

15.     The terms of an Indian treaty must be interpreted to give effect to the terms as the Indians themselves would have understood them.  *Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 196 (1999).  Moreover, Indian treaties must be interpreted liberally in favor of the Indians and any ambiguities must be resolved in their favor.  *Id*. at 20.

5

16.     The only federal appellate court to interpret Article 11 of the 1854 Treaty, the Sixth Circuit Court of Appeals, confirmed this reading of the 1854 Treaty and held that Article 11 prohibits the involuntary alienation and therefore the state taxation of real property held by Indians within the reservations created by the treaty. *See Keweenaw Bay Indian Community v. Naftaly*, 452 F.3d 514 (6th Cir. 2006), *cert. denied*, 549 U.S. 1053 (2006) (the "*KBIC Case*"). A copy of the KBIC Case is attached as Exhibit B.

17.     In the KBIC Case, the Sixth Circuit held that the 1854 Treaty disallowed involuntary state tax sales and state taxation of real property owned by the Keweenaw Bay Indian Community or its members within the reservation created for them pursuant to the 1854 Treaty. *Keweenaw Bay Indian Community*, 452 F.3d 514, at 524–27. The Sixth Circuit stated that this interpretation of the 1854 Treaty is in keeping with its purpose to provide a permanent home for the Chippewa Indians. *Id.* The Sixth Circuit recognized that Congress has not expressed any intention to abrogate treaty rights under the 1854 Treaty, and rejected the argument that the General Allotment Act showed a clear intent of Congress to make the lands at issue taxable. *Id.* at 532–33.

18.     The State of Wisconsin imposes an ad valorem tax upon real property within the state, subject to various exceptions and exemptions, payable by the owner of the property. If a property owner fails to pay the tax assessed upon a land parcel, the parcel will be returned as delinquent and eventually foreclosed and sold for taxes, thereby dispossessing the owner of the property.

19.     After the decision in the KBIC Case, the Town Board of the Town of Sanborn passed Resolution No. 0723-2007 dated July 23, 2007 (the "*Resolution*"). The Resolution stated that pursuant to the KBIC Case, lands allotted in fee simple under the 1854 Treaty owned by the

Tribe or members of the Tribe are not subject to property taxes within the Town of Sanborn. The Town of Sanborn ordered the town assessor to list such land as "non-taxable" on the town's tax roll. A copy of the Resolution is attached as Exhibit C.

20.     After the decision in the KBIC Case, the Wisconsin Department of Revenue provided guidance regarding the taxability of Native American owned fee simple land located on the Reservation in a letter dated April 4, 2007 addressed to local tax assessor Martin Meyer signed by Billy J. Bowers, Director, Bureau of Assessment Practices, Wisconsin Department of Revenue. The letter stated: "With regard to land owned by Native Americans that is covered by the 1854 treaty, there is no presumption of taxability in these instances and the burden to prove taxability rests with the municipality. The municipality would be required to determine whether: (1) the fee simple parcel is within the outer boundary of the reservation, and (2) the parcel was subject to the 1854 treaty." The letter also states that with respect to land owned by Native Americans covered by the 1854 Treaty, "The State does not have authority to tax property that is exempt via federal guidelines unless it is authorized to do so by Congress, so the typical statutorily required documents and exemption requests are not applicable to this type of property." A copy of the April 4, 2007 letter is attached as Exhibit D.

21.     The Wisconsin Department of Revenue reconfirmed its position on the non-taxability of real property owned by Native Americans within reservations created by the 1854 Treaty after the KBIC Case in a letter dated August 24, 2007 addressed to local assessors and signed by Daniel F. Elsass, Administrator, Division of State and Local Finance, Wisconsin Department of Revenue. The letter stated: "When a Native American tribe or tribal member claims a property is exempt under the Treaty of 1854, the property is presumed to be exempt. The

7

onus is on the municipality to challenge this presumption and prove that the property is taxable."
A copy of the August 24, 2007 letter is attached as Exhibit E.

22.    The Resolution and the Wisconsin Department of Revenue's 2007 letters are consistent with the language of the 1854 Treaty and the Sixth Circuit Court of Appeals' interpretation of the 1854 Treaty in the KBIC Case.

23.    The Wisconsin Department of Revenue's position on the non-taxability of Native American owned land on reservations created under the 1854 Treaty inexplicably changed after 2007. Chapter 20 of the Wisconsin Property Assessment Manual (the "*Assessment Manual*") now provides that real property located within a reservation created by the 1854 Treaty is exempt only if: (1) it was allotted before February 8, 1887 under the 1854 Treaty, (2) it is owned in fee simple by the tribe or tribal members, and (3) there has been no conveyance of the land to nontribal members since it was first allotted under the 1854 Treaty. Wis. Dep't of Revenue, 2018 Wis. Prop. Tax Assessment Manual 20-26 (2018).  The Assessment Manual also states that "[a]ssessors should review tax roll information at the Municipality and County along with ownership information at the Register of Deeds office" in order to determine whether the property is exempt from tax under the three criteria. *Id*.

24.    On January 12, 2017, the Ashland County Circuit Court issued an order in the case *Scott Bretting, et al. v. Town of Sanborn Board of Review*, Case No. 16CV-30 (the "*Order*") ordering the Town of Sanborn Board of Review to notify the owners of all properties removed from the tax rolls pursuant to the Resolution of the Board of Review's intention to place the properties back on the assessment roll as taxable.  A copy of the Order is attached as Exhibit F.

25.    The Order required the Town of Sanborn Assessor to tax all properties that stopped being taxed due to the Resolution, unless evidence was presented at a hearing that a specific

8

property: (1) was allotted before February 8, 1887 under the 1854 Treaty; (2) is owned in fee simple by the Tribe or members of the Tribe; and (3) has never been conveyed to nontribal members since it was first allotted under the 1854 Treaty.

26.     Pursuant to the Order, on March 21, 2017, the Board of Review of the Town of Sanborn issued a Notice of Assessment by Board (the "*Notice*") to members of the Tribe whose property was listed as non-taxable due to the Resolution. The Notice invited the recipient property owners to demand a hearing. If the property owner demanded a hearing, the Notice advised that in order for the property to remain non-taxable, the property owner must present evidence at the hearing that his or her property: (1) was allotted before February 8, 1887 under the 1854 Treaty; (2) is owned in fee simple by the Tribe or members of the Tribe; and (3) has never been conveyed to nontribal members since it was first allotted under the 1854 Treaty. A copy of a Notice of Assessment substantially in the form sent to members of the Tribe who own property in the Town of Sanborn is attached as Exhibit G.

27.     The Order and the Notice created a presumption of taxability rather than a presumption of non-taxability with respect to fee simple property owned by the Tribe or its members within the Reservation and placed the burden on the property owner rather than the municipality to establish that the property is nontaxable. The Order and the Notice required the property owner to show that the property was allotted prior to February 8, 1887 and has never been conveyed to nontribal members, rather than requiring the property owner to simply show that their property is located within the Reservation.

28.     At the Board of Review hearing on April 24, 2017 held pursuant to the Notice, members of the Tribe who own property in the Town of Sanborn within the Reservation objected

9

to the proceedings and to the Town of Sanborn Board of Review's intention to place property that stopped being taxed pursuant to the Resolution back on the Town of Sanborn property tax rolls.

29.     The standards for exemption and the process for establishing exemption imposed by the Assessment Manual, the Order, and the Notice violate federal law and contradict the language of the 1854 Treaty, the Sixth Circuit Court of Appeal's interpretation of the 1854 Treaty in the KBIC Case, the Town of Sanborn's own interpretation of federal law as demonstrated in the Resolution, and the guidance of the Wisconsin Department of Revenue following the KBIC Case as demonstrated in the two letters written by Wisconsin Department of Revenue officials following the case.

30.     Federal law, not Wisconsin law, governs whether the Town of Sanborn can impose property tax on fee simple property located within reservations created pursuant to the 1854 Treaty. The Supremacy Clause of Article VI, Clause 2 of the United States Constitution establishes that the Constitution, federal laws made pursuant to it, and treaties made under its authority constitute the supreme law of the land.

31.     The conclusions in the Assessment Manual and the Order that real property is exempt from taxation under the 1854 Treaty only if the Tribe or the tribal member can show that the land was allotted before February 8, 1887 and was never conveyed to a non-Indian is contrary to the plain language of the 1854 Treaty, its promise of a permanent home for the Tribe and its members, and federal law interpreting the interpreting the 1854 Treaty.  Neither the district court in *Keweenaw Bay Indian Community v. Naftaly*, 370 F. Supp. 2d 620 (W. D. Mich), nor the Sixth Circuit in the KBIC Case attached any importance to the date of allotment or whether the real property had ever been conveyed to a non-Indian, and neither court suggested that those facts have any legal relevance.

10

32.     The 1854 Treaty was made under the authority of the United States Constitution and has never been abrogated. The Assessment Manual and Order are preempted by federal law based on the Supremacy Clause.

33.     Involuntary alienation in satisfaction of tax judgments is an integral part of the property tax scheme of the Town of Sanborn. The 1854 Treaty, however, prohibits the involuntary alienation and therefore the imposition of property tax on fee simple property within the Reservation owned by the Tribe or its members.

34.     The Town of Sanborn should bear the burden of proving that fee simple property within the Reservation owned by the Tribe or its members is taxable. As the Wisconsin Department of Revenue advised in its 2007 letters following the KBIC Case, there is a presumption of non-taxability for any fee simple property held by Native Americans within reservations created pursuant to the 1854 Treaty, and the Town of Sanborn bears the burden of proving that the property is taxable. The Order and the Notice reverse the burden of proof and state that there is a presumption of taxability, and that the burden is on the property owner to prove that the land is non-taxable. There is no basis to reverse the burden now. Further, because the Town of Sanborn removed the properties from the tax roll and now seeks to return them to the tax roll, the burden should be on the Town of Sanborn to prove that the property is taxable.

35.     On or around January 30, 2018, Plaintiffs filed a Claim for Recovery of Unlawful Property Taxes in accordance with Wis. Stat. § 74.35 with Defendant (the "*Claim*"). Defendant denied the Claim.

36.     Plaintiffs understand that the Tribe intends to file a federal court action seeking resolution under federal law of whether the Town of Sanborn can impose property tax on fee simple property located within reservations created pursuant to the 1854 Treaty. Plaintiffs have

11

filed this claim for exemption to preserve their claim for refund, and intend to request a stay of this proceeding until after the federal court action has been resolved.

## COUNT I
### (Wis. Stat. § 74.35 - Recovery of Unlawful Taxes)

37.     Plaintiffs repeat and reallege the foregoing paragraphs as though fully set forth herein.

38.     Plaintiffs were aggrieved by the levy and collection of an unlawful tax assessed against their property.  The tax was an "unlawful tax" within the meaning of Wis. Stat. §§ 74.35 and 74.33(1)(c) because Plaintiffs' property is exempt by law from taxation.

39.     Defendant was the taxation district which collected the unlawful tax under Wis. Stat. § 74.35.

40.     Plaintiffs filed a claim for recovery against Defendant pursuant to Wis. Stat. § 74.35.

41.     Defendant disallowed the claim pursuant to Wis. Stat. § 74.35.

42.     Plaintiffs now bring the present action in circuit court to recover the amount of the claim not allowed pursuant to Wis. Stat. § 74.35.

43.     Plaintiffs are bringing the present action within 90 days after Plaintiffs received notice by certified or registered mail that the claim is disallowed.


WHEREFORE, the Plaintiffs request the following:

    (a)     That the Town of Sanborn return to Plaintiffs the 2015, 2016, and 2017 property taxes paid.

    (b)     For such other and further relief as this Court deems appropriate.

12

Dated this 1st day of June, 2018.


                    DORSEY & WHITNEY LLP
                    Attorneys for Plaintiff


                    By: Electronically signed by Skip Durocher
                        Skip Durocher (SBN 1018814)
                        Suite 1500
                        50 South Sixth Street
                        Minneapolis, MN 55402-1498
                        (612) 340-2600

4839-4722-0071\1

# EXHIBIT A

**Parcel #: 022-01600-0300**　　　　　　　　Valid as of 01/26/2018 01:24 PM

Alt. Parcel #:

TOWN OF SANBORN
ASHLAND COUNTY,
WISCONSIN

**Owner and Mailing Address:**
CLARENCE HOULE III
TAMMY HOULE
66950 BAYFRONT RD
ASHLAND WI 54806

**Co-Owner(s):**
HOULE, TAMMY

**Physical Property Address(es):**
* 66950 BAYFRONT RD

**Districts:**

| Dist# | Description |
|-------|-------------|
| 1700 | VTAE DISTRICT |
| 0170 | ASHLAND SCHOOL DIST |

**Legal Description:**　　Acres: 2.780

WEST 150' OF THE EAST 375' OF GOVT LOT 5
LESS THAT LYING SOUTH OF BAYFRONT RD
DOC # 343058 LAND CONTRACT SEC. 1... more...

**Parcel History:**

| Date | Doc # | Vol/Page | Type |
|------|-------|----------|------|
| 09/06/2017 | 343058 | / | LC |
| 08/22/2017 | 342890 | / | TOD |
| 07/07/2014 | 333272 | 736/829 | TOD |
| 06/25/2014 | 333178 | 736/494 | TERM |
| | | | more... |

| Plat | Tract (S-T-R 40¼ 160¼ GL) | Block/Condo Bldg |
|------|---------------------------|------------------|
| * N/A-NOT AVAILABLE | 19-48N-03W | |

**2017 Valuations:**　　　　　　Values Last Changed on 10/04/2017

| Class and Description | Acres | Land | Improvement | Total |
|----------------------|-------|------|-------------|-------|
| G1-RESIDENTIAL | 2.780 | 83,400.00 | 103,200.00 | 186,600.00 |

Totals for 2017

| | | | | |
|----------------------|-------|------|-------------|-------|
| General Property | 2.780 | 83,400.00 | 103,200.00 | 186,600.00 |
| Woodland | 0.000 | 0.00 | 0.00 | 0.00 |

Totals for 2016

| | | | | |
|----------------------|-------|------|-------------|-------|
| General Property | 0.000 | 0.00 | 0.00 | 0.00 |
| Woodland | 0.000 | 0.00 | 0.00 | 0.00 |

**2017 Taxes**　　Bill #: 1141　　Fair Market Value: 146,300.00　　Assessment Ratio: 1.2751

| | Amt Due | Amt Paid | Balance |
|---|---------|----------|---------|
| Net Tax | 3,988.31 | 1,994.16 | 1,994.15 |
| Special Assessments | 0.00 | 0.00 | 0.00 |
| Special Charges | 0.00 | 0.00 | 0.00 |
| Delinquent Charges | 0.00 | 0.00 | 0.00 |
| Private Forest Crop | 0.00 | 0.00 | 0.00 |
| Woodland Tax | 0.00 | 0.00 | 0.00 |
| Managed Forest Land | 0.00 | 0.00 | 0.00 |
| Prop Tax Interest | | 0.00 | 0.00 |
| Spec Tax Interest | | 0.00 | 0.00 |
| Prop Tax Penalty | | 0.00 | 0.00 |
| Spec Tax Penalty | | 0.00 | 0.00 |
| Other Charges | 0.00 | 0.00 | 0.00 |
| TOTAL | 3,988.31 | 1,994.16 | 1,994.15 |

Interest Calculated For 01/26/2018

**Installments**

| | End Date | Total |
|---|----------|-------|
| 1 | 01/31/2018 | 1,994.16 |
| 2 | 07/31/2018 | 1,994.15 |

| | |
|---|---|
| Net Mill Rate | 0.021723475 |
| Gross Tax | 4,325.59 |
| School Credit | 271.98 |
| Total | 4,053.61 |
| First Dollar Credit | 65.30 |
| Lottery Credit　0 Claims | 0.00 |
| Net Tax | 3,988.31 |

**Payment**　(Posted Payments)

| Date | Receipt # | Type | Amount | Note |
|------|-----------|------|--------|------|
| 01/24/2018 | 341 | T | 1,994.16 | 5370 |

# EXHIBIT B

✦ Positive
As of: January 24, 2018 7:36 PM Z

# Keweenaw Bay Indian Cmty. v. Naftaly

United States Court of Appeals for the Sixth Circuit

April 26, 2006, Argued ; June 26, 2006, Decided ; June 26, 2006, Filed

File Name: 06a0207p.06

No. 05-1952

## Reporter

452 F.3d 514 *; 2006 U.S. App. LEXIS 15993 **; 2006 FED App. 0207P (6th Cir.) ***

KEWEENAW BAY INDIAN COMMUNITY, Plaintiff-Appellee, v. ROBERT NAFTALY, et al., Defendants-Appellants, TOWNSHIP OF L'ANSE, et al., Defendants.

**Subsequent History:** US Supreme Court certiorari denied by *Naftaly v. Keweenaw Bay Indian Cmty., 2006 U.S. LEXIS 9043 (U.S., Nov. 27, 2006)*

**Prior History:** [**1] Appeal from the United States District Court for the Western District of Michigan at Marquette.   No. 03-00170 -- David W. McKeague, District Judge.

*Keweenaw Bay Indian Cmty. v. Naftaly, 370 F. Supp. 2d 620, 2005 U.S. Dist. LEXIS 10823 (W.D. Mich., 2005)*

**Counsel:** ARGUED: Todd B. Adams, OFFICE OF THE ATTORNEY GENERAL, Lansing, Michigan, for Appellants.

Vernle C. Durocher, DORSEY & WHITNEY, Minneapolis, Minnesota, for Appellee.

ON BRIEF: Todd B. Adams, OFFICE OF THE ATTORNEY GENERAL, Lansing, Michigan, for Appellants.

Vernle C. Durocher, Mary J. Streitz, DORSEY & WHITNEY, Minneapolis, Minnesota, John R. Baker, KEWEENAW BAY INDIAN COMMUNITY, Baraga, Michigan, Stephen D. Turner, Gregory N. Longworth, LAW, WEATHERS & RICHARDSON, Grand Rapids, Michigan, for Appellee.

**Judges:** Before: GUY, DAUGHTREY, and CLAY, Circuit Judges. CLAY, J., delivered the opinion of the court, in which DAUGHTREY, J., joined. GUY, J., delivered a separate dissenting opinion.

**Opinion by:** CLAY

## Opinion

[*515] [***1] CLAY, Circuit Judge. Defendants Naftaly, et al., appeal the June 1, 2005 order of the United States District Court for the Western District of Michigan granting Plaintiff Keweenaw Bay Indian Community's motion for summary judgment, entering the declaratory judgment that the Michigan General Property Tax Act ("Act"), [**2] *Mich. Comp. Laws § 211.1 et seq.,* was not valid as applied to [***2] real property held in fee simple by Plaintiff or its members within the exterior boundaries of the L'Anse Indian Reservation, and enjoining Defendants from enforcing the Act against said real property. For the following reasons, we AFFIRM the order of the district court.

## I. BACKGROUND

### A. PROCEDURAL HISTORY

On August 13, 2003, Plaintiff filed a complaint in the United States District Court for the Western District of Michigan seeking declaratory and injunctive relief against Defendants. The suit was in response [*516] to Defendants' attempts to assess, collect, and enforce *ad valorem* taxes under the Act against real property within the L'Anse reservation held by Plaintiff or its members in fee simple.

On December 12, 2003, Defendants filed a motion to dismiss under *Federal Rules of Procedure 12(b)(1)* and *12(b)(6)*. On September 27, 2004, the district court denied the motion.

On October 26, 2004, Defendants filed a motion to dismiss under *Rule 12(b)(6)* and a motion for summary

452 F.3d 514, *516; 2006 U.S. App. LEXIS 15993, **2; 2006 FED App. 0207P (6th Cir.), ***2

judgment under *Rule 56*. On December 17, 2004, Plaintiff filed a motion for summary judgment [**3] under *Rule 56* on Counts I and II of its complaint. Count I alleged that Plaintiff was entitled to declaratory and injunctive relief because Congress had not clearly authorized state taxation of the real property at issue. Count II alleged that Plaintiff was entitled to declaratory and injunctive relief because application of the Act would violate the terms of the 1854 Treaty. On June 1, 2005, the district court denied Defendants' motion for summary judgment, granted Plaintiff's motion for summary judgment, entered a declaratory judgment that the Act was not valid as applied to the real property at issue, and enjoined Defendants from enforcing the Act against said real property. On June 28, 2005, Defendants timely filed a notice of appeal.

## B. FACTS

### 1. The Parties

Plaintiff is a federally recognized American Indian tribe and is the successor in interest of the L'Anse and Ontonagon bands of Chippewa Indians. Plaintiff exercises powers of self-governance and jurisdiction over the L'Anse Indian Reservation in Baraga County, Michigan.

Defendant Robert Naftaly is the chairperson of the Michigan State Tax Commission ("Commission"). Defendant Robert Lupi is a member of the [**4] Commission. Defendant Doug Roberts is a member of the Commission. Defendant Dennis Platte is the executive secretary of the Commission. Plaintiff sued these Defendants in their official capacities. These Defendants are the appellants in the instant case.

Defendant L'Anse Township is a political and corporate body of the state of Michigan. Defendant assesses, collects, and enforces real property taxes under the Act. Defendant Baraga Township is a political and corporate body of the state of Michigan. Defendant assesses, collects, and enforces real property taxes under the Act. Defendant Matthew Arko is the assessor for L'Anse Township and Baraga Township. These Defendants did not appeal the district court's decision.

### [***3] 2. The History Preceding the 1854 Treaty

The following historical account was found by a district court in a case unrelated to the case before this Court, *Keweenaw Bay Indian Community v. State of Michigan, 784 F. Supp. 418 (W.D. Mich. 1991)*:

> The Keweenaw Bay is located on the southern shore of Lake Superior in Michigan's Upper Peninsula. From the earliest records there existed a band of Lake Superior Chippewa Indians near the [**5] mouth of the Bay, on an east-west transportation corridor used by the Indians and later by fur traders. The Indians subsisted before the coming of European society, consistent with their traditional lifestyle, which included annual rounds of hunting and trapping in the Winter and fishing in the Spring, Summer and Fall. The Lake Superior Chippewas' lifestyle was first impacted [*517] by contact with the French, followed by the English and finally by the Americans. Euro-American contacts exposed the Chippewa, inter alia, to Christianity, a new kind of market economy, greed and avarice for their lands, intoxicants, disease, and a new style of dress and abode. These contacts, of course, did not supplant their culture.
> . . . .
> The 1832 expedition of Henry Schoolcraft, followed by Douglas Houghton's famous exploration of the western Upper Peninsula, outlined the immense mineral reserves of the Western Range and the Keweenaw Peninsula, which were all held at that time by the Indians, pursuant to their unextinguished aboriginal title. Not surprisingly, these rich mineral deposits evoked considerable interest from land speculators, miners, and the federal government.
>
> The United States [**6] Congress appropriated money on March 3, 1841, to defray expenses of entering into a treaty with the Chippewa for the extinguishment of their title within the State of Michigan where the mineral deposits were found. The Treaty with the Chippewa, *7 Stat. 591*, was subsequently negotiated on October 4, 1842, under which the Indians conveyed to the United States their aboriginal title to the entire western half of Michigan's Upper Peninsula, including the Keweenaw Bay area, and to all of northern Wisconsin. Although Article III of the treaty provided for the eventual removal of the Indians to an area to the west occupied by the Mississippi Chippewa, it was thought that such removal would not take place for a considerable time in the future. Ex. P-7. In Article II, the Indians stipulated for the right to hunt in the ceded territory, together "with the other usual

452 F.3d 514, *517; 2006 U.S. App. LEXIS 15993, **6; 2006 FED App. 0207P (6th Cir.), ***3

privileges of occupancy, until required to remove by the President of the United States . . . ." Article VI provided that the Indians would be subject to removal from the mineral district at the pleasure of the President. It was contemplated that this limited removal from the mineral areas, if it occurred, would not move the Indians [**7] out of the remainder of their cession area. Article IV provided for the payment of annuities and the furnishing of goods and services to the Indians, including blacksmiths and carpenter shops, and schools. Notwithstanding the cession of title, the United States' laws with respect to trade and intercourse with non-Indians were to remain in effect in the ceded territory.

The events at Keweenaw Bay following the signing of the 1842 Treaty were significant. In accord with the treaty, farmers and blacksmiths were provided to the L'Anse band, along with funding to the mission boards in order to provide schools for the Indians. Although the treaty did not provide for land reservations, by all accounts the Indians were advised, and they so understood, that their lifestyle would [***4] be essentially unchanged after the treaty because the government only sought their minerals. Notwithstanding these assurances, the Indians, who did not want to remove, were very apprehensive about that potential. Of course, the threat of removal at that time seemed remote because the Indians were not living within the two important mineral districts in the area. The Indians' comfort was short-lived, [**8] however, due to the commencement of land surveying in 1845, which meant that legal descriptions could be made and land could be sold. To the Indians, land sales meant that their removal was likely and imminent.

On February 6, 1850, the President issued a removal order, pursuant to the 1842 Treaty. I Tr. 159. However, that [*518] order was subsequently withdrawn in August, 1851, and the Indians were never actually required to remove. II Tr. 164. Nevertheless, according to Henry C. Gilbert, the Michigan Indian agent who negotiated the subsequent 1854 treaty, removal was "the great terror of their [the Indians'] lives and I hazard nothing in saying they will sooner submit to extermination than comply with it." Ex. P-25; II Tr. 166.

The survey of the Upper Peninsula area around Keweenaw Bay was completed in 1848. Some land

purchases began to occur on both sides of the Bay at about that time. Numerous urgent letters and petitions from Indians and their representatives to Indian agents and the President evidenced concern about removal and revealed a desire to purchase land around the Bay by and for the benefit of the Indians. . . . Many Indians in the Keweenaw Bay area adopted American-style [**9] (or non-Indian) names, clothing, houses, and other customs. Some swore allegiance to the United States before a magistrate. These accommodations to American culture were often intended to demonstrate the Indians' advanced degree of "civilization". It was hoped by some that such accommodations would convince the government to grant them citizenship and permit them to remain in their homes rather than force them to remove to the west. Ex. D-71; VI Tr. 792; VII Tr. 906-907. A consistent Indian theme throughout the period of removal and prior to the 1854 Treaty was an ardent desire for permanent homes for the Indians in their present locations.

. . . .

The evidence indicates that in the 1840's, the federal government's policy towards Indians, known as "removal," was being abandoned. Removal was characterized by the movement of tribes from the eastern portion of the United States to lands to the west, out of the path of western settlement by non-Indians. The removal policy became antiquated as the settlement patterns of non-Indians moved inexorably westward. It became clear in the 1840's that there was rapidly becoming no place to move the Indians. II Tr. 184-5. The benevolent [**10] rationale for the removal was to isolate the Indians from the adverse impacts resulting from their contacts with non-Indian society. Of course, the primary motivation was to free Indian lands from their claims to them so the lands could be settled by non-Indians.

This same rationale underlay the creation of the reservation system, which replaced the removal policy. II Tr. 186. The separatism that was hoped for could no longer be achieved through removal. However, Commissioner George W. Manypenny believed that the civilization policy could be achieved through the reservation system. Thus, he believed that if the Indians were temporarily isolated on discrete parcels, away from the deleterious influence of non-Indians, they could gradually become assimilated or "civilized" and eventually could be incorporated completely [***5]

452 F.3d 514, *518; 2006 U.S. App. LEXIS 15993, **10; 2006 FED App. 0207P (6th Cir.), ***5

into non-Indian society. VII Tr. 1022. The reservation concept as a "way-station" was a necessary step, then, in the civilization process. VII Tr. 967.

. . . The new policy of the government was to provide "permanent homes" on the reservations that were set aside for the Indians and upon which trespass by non-Indians would not be tolerated. Additionally, [**11] there were three evils attendant to the government's policy in the past, which Manypenny sought to avoid in the future: first, the payment to the Indians of excessive annuities, which [*519] promoted profligacy and the consumption of intoxicants; second, excessive quantities of land held in common; and third, continued changes in location in advance of the western movement of settlers. The 1854 Treaty, as well as others negotiated during this period, were intended to address these articulated evils.

Correspondence from Commissioner Manypenny to the Indian agents about to undertake treaty negotiations with the Lake Superior Chippewa in the early 1850's is critical to an understanding of the government's intentions. One of the four letters of instruction from Commissioner Manypenny to Henry C. Gilbert provides:

> I send herewith a copy of the instructions of the Secretary of War of the date of 4th June of 1847 when a former commissioner attempted to treat with these indians but failed. According to the estimates of this office, the Chippewa own about 10,743,000 acres of land, the greater part of which is of no value to them, and never will be. Some portions of it will be valueless [**12] to the white population.

> Nevertheless, the condition of affairs with the Chippewas is such that it is the duty of the Government to offer them an opportunity to dispose of their tenure to their Country, and in lieu thereof, to give them a small tract as a permanent home, with such means of support & mental & moral improvement as may be of great advantage to them.

*Id. at 420-23.*

## 3. The 1854 Treaty

On September 30, 1854, the President of the United States and the Chippewa Indians of Lake Superior and Mississippi entered into a treaty ("1854 Treaty"). Treaty with the Chippewa, September 30, 1854, *10 Stat. 1109.* Under the 1854 Treaty, the Chippewa Indians ceded to the United States a substantial amount of land in eastern Minnesota. In exchange, the United States set aside permanent reservations for the various bands of Lake Superior and Mississippi Chippewa. The United States also provided annuities, goods, and services in consideration of the cessation.

Article 3 of the 1854 Treaty outlined certain powers the President maintained with respect to the reservation lands:

> The United States will define the boundaries of the reserved tracts, [**13] whenever it may be necessary, by actual survey, and the President may, from time to time, at his discretion, cause the whole to be surveyed, and may assign to each head of a family or single person over twenty-one years of age, eighty acres of land for his or their separate use; and he may, at his discretion, as fast as the occupants become capable of transacting their own affairs, issue patents therefor to such occupants, with such restrictions of the power of alienation as he may see fit to impose. And he may also, at his discretion, make rules and regulations, respecting the disposition of the lands [***6] in case of the death of the head of a family, or single person occupying the same, or in case of its abandonment by them. And he may also assign other lands in exchange for mineral lands, if any such are found in the tracts herein set apart. And he may also make such changes in the boundaries of such reserved tracts or otherwise, as shall be necessary to prevent interference with any vested rights. All necessary roads, highways, and railroads, the lines of which may run through any of the reserved tracts, shall have the right of way through the same, compensation being made [**14] therefor as in other cases.

[*520] Importantly for the instant case, the President had the power to assign land to individual Chippewa Indians, and he also had the power to place restrictions on these allotments, as well as the power to remove such restrictions. One such restriction would be a restriction on alienation.

Article 10 allowed missionaries, teachers, and other non-Chippewa Indians who resided in the ceded territory or the reservations to remain on their occupied

452 F.3d 514, *520; 2006 U.S. App. LEXIS 15993, **14; 2006 FED App. 0207P (6th Cir.), ***6

land at a minimum price. [1]

[**15] Article 11 listed certain restrictions placed upon the United States:

All annuity payments to the Chippewas of Lake Superior, shall hereafter be made at L'Anse, La Pointe, Grand Portage, and on the St. Louis River; and the Indians shall not be required to remove from the homes hereby set apart for them. And such of them as reside in the territory hereby ceded, shall have the right to hunt and fish therein, until otherwise ordered by the President.

The 1854 Treaty was ratified on January 10, 1855. Subsequently, the President periodically assigned parcels of the reservation to individual Chippewa Indians pursuant to his power under Article 3 of the treaty. The real property in dispute in the instant case are those parcels allocated under Article 3 and those parcels allocated under Article 10 that are now in the possession of Plaintiff or its members.

## 4. Tax Treatment of Real Property Within the Reservation

After the 1854 Treaty, none of the lands within the reservation held by Plaintiff's predecessor tribes or its members in fee was subject to the Act and its *ad valorem* real property tax. In 1982, the Michigan Tax Tribunal explicitly held that lands held by [**16] Plaintiff and its members were not subject to the Act; however, the tribunal held that lands within the boundaries as described by Article 2 of the 1854 Treaty that were sold by the United States prior to the ratification of the treaty were not part of the reservation and were subject to taxation. *Baraga County Equalization Dep't v. Darcy*, MTT Docket No. 29713 (Feb. 23, 1982).

------

[1] A district court ruled that the lands allocated pursuant to Article 10 of the 1854 Treaty that were within the boundaries of the reservation constituted a part of the reservation. *Keweenaw Indian Bay Cmty., 784 F. Supp. at 424-25*. The court also concluded that parcels of land sold by the United States to non-Indians before the 1854 Treaty that were within the boundaries of the reservation also constituted a part of the reservation. *Id.* In sum, the court concluded that the physical description of the reservation as provided for in Article 2 of the treaty defined the exterior boundaries of the reservation, regardless of the fact that certain non-Indians owned real property within those boundaries. That decision was not appealed.

In 1991, a district court held that lands sold by the United States prior to the ratification of the 1854 Treaty were a part of the reservation. *Keweenaw Indian Bay Cmty., 784 F. Supp. at 424-25*. *See also* note 1, *supra* . After this ruling, Plaintiff filed a motion in district court to hold the state of Michigan in contempt for failing to prevent Baraga Township and Baraga County from seeking taxes on those lands sold prior to the 1854 Treaty. The district court held that the imposition of such taxes was improper in light of the previous ruling that those lands were part of the reservation, but [***7] it did not hold the state in contempt, as the state had not been allowed to correct the actions of the town and the county. *Keewenaw Bay Indian Cmty. v. State of Michigan*, No. [**17] 2:87-CV-00278-RHB (W.D. Mich. Nov. 19, 1991).

In 1992, the Michigan state treasurer filed a petition in state court seeking the [*521] sale of certain real property held by Plaintiff or its members due to tax delinquencies. Plaintiff and its members objected to the sale of the lands. The state court dismissed the objections of Plaintiff and its members on the ground that the Michigan Tax Tribunal had exclusive jurisdiction over the case, but the court stayed the sale. In March 1993, Plaintiff and its members filed their objections to the sale of the lands with the Michigan Tax Tribunal. In March 1994, the Michigan Tax Tribunal entered a consent judgment with respect to Plaintiff and its members, L'Anse Township, Baraga Township, and Baraga County. The consent judgment found that real property held by Plaintiff or its members that was within the exterior boundaries of the reservation was exempt from *ad valorem* taxes under the Act. As a result, such property was to be taken off of the assessment rolls and listed as exempt. These exempt properties, however, were placed on a special "tribal assessment roll," and Plaintiff and its members would pay exactly the amount of taxes that would have [**18] been due had the properties been kept on the ordinary assessment roll.

From May 1994 to February 1999, the parties followed the dictates of the consent judgment. In February 1999, the Commission sent a bulletin to assessors and equalization directors instructing them to place all real property owned by American Indian communities and their members on the assessment rolls. This decision was based on the Commission's reading of *Cass County v. Leech Lake Band of Chippewa Indians, 524 U.S. 103, 118 S. Ct. 1904, 141 L. Ed. 2d 90 (1998)*.

In February 1999, L'Anse Township, Baraga Township, Baraga County, and two of Plaintiff's members filed a

452 F.3d 514, *521; 2006 U.S. App. LEXIS 15993, **18; 2006 FED App. 0207P (6th Cir.), ***7

writ of mandamus in state court to prevent the Commission from interfering with the consent judgment. The state trial court issued the writ of mandamus. The state court of appeals affirmed, holding that the Commission was barred by principles of *res judicata* from interfering with the consent judgment. The state supreme court reversed and found that the Commission was not bound by the consent judgment, although the court did not address the validity of *ad valorem* taxes on real property held by Plaintiff or its members.

In February 2003, the [**19] Commission ordered Defendant Arko to place real property held by Plaintiff or its members on the 2003 assessment rolls. Defendant Arko did so and mailed assessment notices to Plaintiff and its members. The Commission also ordered Defendant Arko to place such property on the 1999, 2000, 2001, and 2002 assessment rolls for L'Anse Township and the 2000, 2001, and 2002 assessment rolls for Baraga Township. Defendants L'Anse Township and Baraga Township issued *ad valorem* tax bills for real property held by Plaintiff or its members that was located within the exterior boundaries of the reservation. Throughout the dispute, Plaintiff and its members continued to abide by the consent judgment and paid the equivalent of the taxes that would have been owed on their holdings of real property if such property were on the ordinary assessment rolls.

## II. DISCUSSION

## A. THE PROPER INTERPRETATION OF THE 1854 TREATY

### 1. Standard of Review

This Court reviews the district court's decision on a motion for summary judgment de novo . *Turner v. City of Taylor, 412 F.3d 629, 637 (6th Cir. 2005)* (citation omitted). The moving party is entitled to summary judgment [**20] "if the pleadings, depositions, answers to interrogatories, [*522] and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Fed. R. Civ. [***8] P. 56(c)*. The Court must view the facts and all of the inferences drawn therefrom in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)* (citation

omitted).

### 2. Analysis

The district court did not err in granting summary judgment in favor of Plaintiff on the ground that the 1854 Treaty disallows involuntary alienation of real property held by Plaintiff or its members. While Defendants offered an alternative interpretation of the 1854 Treaty, principles of American Indian treaty construction support the district court's decision.

### a. Legal Framework

The Supreme Court's modern jurisprudence with respect to the interaction of state tax laws and treaties with American Indians is based in *McClanahan v. State Tax Commission of Arizona, 411 U.S. 164, 93 S. Ct. 1257, 36 L. Ed. 2d 129 (1973)*. In [**21] that case, the plaintiff, a Navajo Indian, challenged the state taxation of her income, which was derived solely from activity within the Navajo reservation. *Id. at 165-66*. Before addressing the merits of the plaintiff's claim, the Supreme Court emphasized that there was a "deeply rooted" policy of preventing a state from asserting jurisdiction or otherwise interfering with American Indians. *Id. at 168* (citation omitted). Indeed, in *Worcester v. Georgia*, "Chief Justice Marshall held that Indian nations were 'distinct political communities, having territorial boundaries, within which their authority is exclusive, and having a right to all the lands within those boundaries, which is not only acknowledged, but guarantied by the United States.'" *Id.* (quoting *Worcester v. Georgia, 31 U.S. (6 Pet.) 515, 557, 8 L. Ed. 483 (1832))*. The notion that American Indians constituted a separate entity not subject to the laws of the state was known as the Indian sovereignty doctrine. The Court noted that under that doctrine, the Court had rejected a state's attempt to tax the lands within an American Indian reservation. *Id. at 169* (citing [**22] *The New York Indians, 72 U.S. (5 Wall.) 761, 18 L. Ed. 708 (1867)*; *The Kansas Indians, 72 U.S. (5 Wall.) 737, 18 L. Ed. 667 (1867))*.

The Court recognized that the Indian sovereignty doctrine had evolved and that there were certain instances where a state could impose its laws on American Indians and on actions that occurred on reservation lands. *Id. at 171-72*. The Court explained:

The Indian sovereignty doctrine is relevant, then, not because it provides a definitive resolution of the

452 F.3d 514, *522; 2006 U.S. App. LEXIS 15993, **22; 2006 FED App. 0207P (6th Cir.), ***8

issues in this suit, but because it provides *a backdrop against which the applicable treaties and federal statutes must be read*. It must always be remembered that the various Indian tribes were once independent and sovereign nations, and that their claim to sovereignty long predates that of our own Government. Indians today are American citizens. . . . But it is nonetheless still true . . . that "(t)he relation of the Indian tribes living within the borders of the United States . . . (is) an anomalous one and of a complex character. They were, and always have been, regarded as having a semi-independent position when they preserved their tribal relations; not as States, [**23] not as nations, not as possessed of the full attributes of sovereignty, but as a separate people, with the power of regulating [*523] their internal and social relations, and thus far not brought under the laws of the Union or of the State within whose limits they resided."

*Id. at 172-73* (alterations in the original) (quoting *United States v. Kagama, 118 U.S. 375, 381-82, 6 S. Ct. 1109, 30 L. Ed. 228 (1886))* (emphasis supplied).

Turning to the facts in the case, the Supreme Court held that the treaty with the Navajo Indians precluded the state from extending state tax law to Navajo Indians on the reservation. *Id. at 174-75*. Although the treaty did not contain an express provision that disallowed state taxation of the Navajo Indians, the Court recognized that the treaty was "not to be read as an ordinary [***9] contract agreed upon by parties dealing at arm's length with equal bargaining positions." *Id. at 174*. The Court recognized that American Indians, such as the Navajo, signed treaties under duress and in hopes of creating a permanent home for themselves. *Id.* "It is circumstances such as these which have led this Court in interpreting Indian treaties, to adopt [**24] the general rule that '(d)oubtful expressions are to be resolved in favor of the weak and defenseless people who are the wards of the nation, dependent upon its protection and good faith.'" *Id.* (alteration in the original) (quoting *Carpenter v. Shaw, 280 U.S. 363, 367, 50 S. Ct. 121, 74 L. Ed. 478 (1930))*. Relying on "this canon of construction" in conjunction with the backdrop of Indian sovereignty, the Court concluded that the treaty established a reservation where the Navajo Indians had exclusive sovereignty under general federal supervision, such that the state could not tax activities on the reservation. *Id. at 174-75*.

Treaty construction in favor of American Indians has a

well-established pedigree. In *The Kansas Indians*, the Supreme Court noted:

> [E]nlarged rules of construction are adopted in reference to Indian treaties. In speaking of these rules, Chief Justice Marshall says: "The language used in treaties with the Indians *shall never be construed to their prejudice*, if words be made use of which are susceptible of a more extended meaning than their plain import as connected with the tenor of their treaty."

*72 U.S. (5 Wall.) at 760* [**25] (quoting *Worcester, 31 U.S. (6 Pet.) at 582*) (emphasis supplied). Under this principle, the Supreme Court interpreted a treaty with the Miami Indians, which stated that reservation lands were exempt from "levy, sale, execution, and forfeiture," as preventing state taxation of those lands. The Court reasoned:

> Applying this principle [of treaty construction] to the case in hand, is it not evident that the words "levy, sale, and forfeiture" are susceptible of meaning, which would extend them to the ordinary proceedings for the collection of taxes? Taxes must be first levied, and they cannot be realized without the power of sale and forfeiture, in case of non-payment. The position, it seems to us, is too plain for argument. The object of the treaty was to hedge the lands around with guards and restrictions, so as to preserve them for the permanent homes of the Indians. In order to accomplish this object, they must be relieved from every species of levy, sale, and forfeiture-from a levy and sale for taxes, as well as the ordinary judicial levy and sale.

*Id. at 760-61*.

The Supreme Court recently reaffirmed the principle of treaty construction in favor [**26] of American Indians in *Minnesota v. Mille Lacs Band of Chippewa Indians, 526 U.S. 172, [*524] 119 S. Ct. 1187, 143 L. Ed. 2d 270 (1999)*. There, the Court stated: "[W]e interpret Indian treaties to give effect to the terms as the Indians themselves would have understood them." *Id. at 196* (citations omitted). The Court continued: "We have held that Indian treaties are to be interpreted liberally in favor of the Indians, . . . and that any ambiguities are to be resolved in their favor . . . ." *Id. at 200* (citations omitted). *See also Winters v. United States, 207 U.S. 564, 576-77, 28 S. Ct. 207, 52 L. Ed. 340 (1908)* ("By a rule of interpretation of agreements and treaties with the Indians, ambiguities occurring will be resolved from the standpoint of the Indians. And the rule should certainly

452 F.3d 514, *524; 2006 U.S. App. LEXIS 15993, **26; 2006 FED App. 0207P (6th Cir.), ***9

be applied to determine between two inferences, one of which would support the purpose of the agreement and the other impair or defeat it.").

## B. Application to This Case

The district court did not err in granting summary judgment in favor of Plaintiff. The district court's interpretation of the 1854 Treaty, finding that the treaty prevented involuntary state [**27] alienation and therefore state taxation of real property, comports with the backdrop of American Indian sovereignty and principles of treaty construction in favor of American Indians.

[***10] The focus of the analysis is Article 11 of the 1854 Treaty, which states, in relevant part, "[T]he Indians shall not be required to remove from the homes hereby set apart for them." Plaintiff asserts that the provision disallows any form of involuntary alienation, including the sale of real property in fulfillment of a tax judgment. In support, Plaintiff offered the expert opinion and report of Dr. Charles E. Cleland ("Cleland"), Distinguished Professor Emeritus of anthropology and ethnohistory at Michigan State University. Cleland observed that, at the time of the 1854 Treaty, the Lake Superior Chippewa were very concerned with the prospect of removal from their homelands, and they were "particularly anxious" to broker an agreement to create permanent reservations for themselves. That agreement, the 1854 Treaty, contained Article 11, which Cleland gave the following interpretation: "Article 11 solemnly guarantees that the signatory band would never be required involuntarily to leave or [**28] give up their reservations created by the treaty for any reason." (J.A. at 254.) Cleland opined that imposition of state tax liability on real property, and the concomitant power to place tax liens on real property, "would be fundamentally contrary to the purpose of the treaty, that is, to provide secure and permanent homes for the [Chippewa Indians]." (J.A. at 255.) Cleland came to the ultimate conclusion:

> Certainly [the Chippewa Indians] did not understand the idea of taxation as a condition of holding their permanent reservation. If, in 1854 [federal agent] Gilbert had told the [Chippewa Indians] that they had to pay money each year to hold their land, the [Chippewa Indians], who had very limited access to hard currency, would have most certainly objected. In fact, they would not have signed the treaty. Gilbert made this point with Commissioner

Manypenny when he reported on the draft treaty. "We found that the points most strenuously insisted upon by them were first *the privilege of remaining* in the country where they reside and next the appropriation of land for their future homes. Without yielding these points, it was idle for us to talk about a treaty. [**29] We therefore agreed to the selection of lands for them in the territory heretofore ceded." (emphasis in the original)

(J.A. at 79) (footnote omitted).

In response, Defendants assert that the Chippewa Indians intended to subject [*525] themselves to state taxes under the 1854 Treaty, as they were eager to participate as citizens of the United States and the states where they resided. In support, Defendants offered the expert opinion and report of Dr. Anthony G. Gulig ("Gulig"), an assistant professor at University of Wisconsin-Whitewater. Gulig found that, in the time preceding the 1854 Treaty, "the Lake Superior Chippewas . . . were not merely opposed to removal, but many had taken up land, were well versed in modern agriculture, and took seriously the business of voting and otherwise interacting with the newcomer society around them." (J.A. at 525.) Gulig found that it was the notion of general removal that the Chippewa Indians feared, and, to combat this fear, they sought not merely reservations, but individual property ownership. The Chippewa Indians, in Gulig's opinion, were eager to take on individual allotments pursuant to the 1854 Treaty; indeed, the "most significant challenge [**30] to the administration of the allotment provision of the 1854 Treaty, as it turned out, was that the land was not surveyed and allotted to them quickly enough." (J.A. at 553-54.) From the findings that the Chippewa Indians sought individual allotments, Gulig concluded, "[I]t is clear that the Chippewas of Lake Superior . . . knew the economic value and liability of the land they sought to acquire both as reservations and as individual allotments." (J.A. at 555.) Defendants also presented the expert opinion and report of Dr. Emily Greenwald ("Greenwald"), who opined that, at the very latest, the Chippewa Indians knew in 1919 that the land they held individually could be taxed. Greenwald, however, admitted that "[i]t is not clear whether [the Chippewa Indians] knew that their lands became taxable when title was conveyed" when they signed the 1854 Treaty. (J.A. at 607.)

In our view, the language of Article 11 of the 1854 Treaty is ambiguous. It is unclear whether the provision precluded all forms of involuntary alienation, including the sale of lands in [***11] satisfaction of tax liabilities,

452 F.3d 514, *525; 2006 U.S. App. LEXIS 15993, **30; 2006 FED App. 0207P (6th Cir.), ***11

or only the general removal of the Chippewa Indians from the reservation area. As made [**31] amply clear by Supreme Court precedent, this Court must read this ambiguity in favor of Plaintiff and its members, and against the backdrop of the Indian sovereignty doctrine and the notion that American Indian tribes enjoy quasi-sovereignty. This backdrop reinforces Plaintiff's interpretation that the treaty disallowed involuntary state tax sales, and thus state taxation, of real property held by Plaintiff or its members. Moreover, this Court must read the 1854 Treaty in favor of one inference if such inference supports the purpose of the treaty and the opposing inference subverts such purpose. _Winters, 207 U.S. at 576-77._ In this case, the purpose of the 1854 Treaty was to provide a permanent home for the Chippewa Indians, a purpose that would be weakened by the interpretation of Defendants that the sanctioning of involuntary alienation of land held by Plaintiff or its members through tax sales. Even setting aside these canons of treaty construction, which are a matter of law and thus support the district court's grant of summary judgment, Plaintiff's interpretation is much more persuasive. As the district court stated: "It defies logic to believe that the Indians [**32] would have signed a treaty ceding over seven million acres to the United States, knowing that they could lose the land they kept as a reservation the following year, due to non-payment of taxes." (J.A. at 637.) We agree with Cleland that the Chippewa Indians did not know nor did they have reason to know that, in setting aside a permanent reservation for them, the 1854 Treaty also required the Chippewa Indians to pay taxes [*526] each year on allotted land, with the potential of losing those allotted lands.

Defendants' experts provide opinions that we do not find persuasive in the present context. Gulig's report focuses primarily on the desire of Chippewa Indians to own land individually to prevent removal and to join the larger societies of the state and the United States. Assuming this view to be accurate, Gulig's report says little as to whether Chippewa Indians understood that, under the 1854 Treaty, individual allotment and ownership came with the price tag of state taxation. Gulig's report makes clear that the Chippewa Indians sought individual allotments for the benefits such allotments provided, but it does not contain a single piece of evidence that demonstrates that the Chippewa [**33] Indians knew that lands allotted under the 1854 Treaty would be subject to taxation and the attendant possibility of involuntary alienation. Gulig relies heavily on the fact that Michigan allowed those American Indians whom the state considered "civilized" to vote in state elections,

and the fact that "Indians wanted to participate as citizens of the state, and taxation was an important part of that citizen participation." (J.A. at 531-32.) Besides this unsupported conclusory assertion, Gulig hardly even mentions taxation. Greenwald readily admitted in her report that it was "unclear" whether the Chippewa Indians knew of the tax liabilities of land ownership; she only concluded that by 1919, the Chippewa Indians knew that individually held property was subject to taxation. As noted by the district court, "this conclusion does not enlighten the Court as to what the Indians may have believed at the time the Treaty was signed" and is therefore of little use in interpreting the 1854 Treaty. (J.A. at 634-35 n.4.)

In their brief to this Court, Defendants make two arguments. First, Defendants argue that Plaintiff's interpretation of the 1854 Treaty cannot stand, as it would create a system [**34] of "perpetual tutelage" and would be contrary to a purpose of the 1854 Treaty to "civilize" the Chippewa Indians. (Defs. Br. 39.) We disagree. Plaintiff's interpretation merely disallows involuntary alienation; any voluntary form of alienation, assuming the President has allowed such alienation under Article 3 of the treaty, would be permissible. Moreover, as Defendants readily admit, the point of restrictions on alienation of the land was to encourage the "civilizing" of the Chippewa Indians, as there was a "concern that the Native Americans would lose control of the land and thereby end the 'civilization' process." (Defs. Br. 39 n.88.) Thus, Plaintiff's interpretation is more in line with the purpose of "civilizing" the Chippewa Indians by ensuring that they would maintain control of the land by shielding that land from involuntary alienation such as a tax sale.

Second, Defendants argue that, before a tax sale of allotted land could take place, an allotment in fee simple would have to be made, and such allotment was subject to a series of [***12] procedures and safeguards, such as ensuring that the allottee was competent to manage the land. This argument is irrelevant. Whether [**35] there was procedure in place to ensure an allottee was responsible before an unrestricted allotment took place simply has no bearing as to whether the Chippewa Indians understood that an allotment was coupled with taxation.

The point is that while Plaintiff's and Defendant's interpretations represent competing inferences from ambiguous language in Article 11 of the 1854 Treaty, Plaintiff's interpretation is far more compelling. The Chippewa Indians envisioned land set aside for them

452 F.3d 514, *526; 2006 U.S. App. LEXIS 15993, **35; 2006 FED App. 0207P (6th Cir.), ***12

permanently; it simply does not make sense that the Chippewa [*527] Indians would disapprove of the mass removal of their society but would sanction a gradual removal of individuals through involuntary alienation. As Cleland notes, this is especially true considering that the Chippewa Indians did not have much hard currency to pay annual property taxes. Like the treaty at issue in *The Kansas Indians*, "The object of the treaty was to hedge the lands around with guards and restrictions, so as to preserve them for the permanent homes of the Indians. In order to accomplish this object, they must be relieved from every species of levy, sale, and forfeiture- from a levy and sale for taxes, as well as the ordinary [**36] judicial levy and sale." *72 U.S. (5 Wall.) at 760-61*. Likewise, in order to accomplish the object of the 1854 Treaty, the preservation of a permanent home for the Chippewa Indians, Plaintiff and its members must be relieved of every species of involuntary removal, including a levy and sale for taxes. As a matter of law, the district court was required to read the ambiguous language of the 1854 Treaty in favor of Plaintiff, a decision that was also practically sound.

## B. ABSENCE OF CLEAR CONGRESSIONAL INTENT TO ALLOW TAXATION

### 1. Standard of Review

This Court reviews the district court's decision on a motion for summary judgment de novo . *Turner, 412 F.3d at 637* (citation omitted). The moving party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Fed. R. Civ. P. 56(c)*. The Court must view the facts and all of the inferences drawn therefrom in the light most favorable [**37] to the nonmoving party. *Matsushita Elec. Indus. Co., 475 U.S. at 587* (citation omitted).

### 2. Analysis

The district court did not err in granting summary judgment in favor of Plaintiff on the ground that Congress has not expressed a clear intent to make alienable the property held in fee simple by Plaintiff or its members within the reservation.

### a. Legal Framework

While the 1854 Treaty is properly interpreted as preventing the involuntary alienation of, and thus the taxation of, reservation lands held in fee simple by Plaintiff or its members, Congress may abrogate treaty rights; Congress must, however, clearly express its intent to do so. *Mille Lacs Band of Chippewa Indians, 526 U.S. at 202* (citing *United States v. Dion, 476 U.S. 734, 738-40, 106 S. Ct. 2216, 90 L. Ed. 2d 767 (1986))*. "There must be 'clear evidence that Congress actually considered the conflict between its intended action on the one hand and Indian treaty rights on the other, and chose to resolve that conflict by abrogating the treaty.'" *Id. at 202-03* (quoting *Dion, 476 U.S. at 740*).

Independent of Congress' power to abrogate American Indian treaty [**38] rights, Congress may allow state taxation of American Indian reservation lands, but only if it expresses its clear intention to do so. The seminal case of permitted state taxation of American Indian reservation lands is *Goudy v. Meath, 203 U.S. 146, 27 S. Ct. 48, 51 L. Ed. 130 (1906)*. The plaintiff, a Puyallup Indian, claimed that certain property allotted to him under treaty was exempt from state taxation. *Id. at 146*. The treaty stated that any [***13] land [*528] allotted under the treaty was exempt from levy, sale, or forfeiture until the formation of a state constitution and the removal of the land restrictions by the state legislature. *Id. at 147*. The treaty went on to say that a state legislature could not remove the land restrictions without the consent of Congress. *Id.* Under the treaty, the plaintiff was allotted certain property in 1886. In 1887, Congress enacted the Indian General Allotment Act, also known as the Dawes Act, *24 Stat. 388*. The Dawes Act was legislation that allowed the President to allot reservation lands to individual American Indians. Section 5 of the Dawes Act stated that land allotted to American Indians was freely alienable, [**39] after the United States held such allotted land in trust for the allottees for twenty-five years. [2] In 1889, the state of Washington joined the United States, and that same year the state legislature passed a law that lifted the land restrictions in the treaty. *Id.* In 1893, Congress passed legislation, *27 Stat. 612*, that allowed the

---

[2] Although the *Goudy* Court did not specify its reliance on Section 5 of the Dawes Act in its decision, the Supreme Court later interpreted *Goudy* as having rested primarily on that section. See *County of Yakima v. Confederated Tribes and Bands of the Yakima Indian Nation, 502 U.S. 251, 263-64, 112 S. Ct. 683, 116 L. Ed. 2d 687 (1992)*.

452 F.3d 514, *528; 2006 U.S. App. LEXIS 15993, **39; 2006 FED App. 0207P (6th Cir.), ***13

alienability of land allotted to Puyallup Indians ten years after the passage of that legislation. [3] *Id.* The plaintiff recognized that Congress had made his allotment freely alienable; however, he argued that Congress had also not expressly repealed the provision in the treaty that protected his allotment from levy, sale, or forfeiture, so that his allotment was not taxable. *Id. at 148-49.*

[**40] The Supreme Court held that the plaintiff's allotment was subject to state taxation. The Court found that while Congress could provide that real property was subject to voluntary alienation but immune from involuntary alienation, Congress' "intent to do so should be clearly manifested." *Id. at 149.* The Court reasoned that from a general perspective, "it would seem strange to withdraw this protection [against voluntary alienation] and permit the Indian to dispose of his lands as he pleases, while at the same time releasing it from taxation." *Id.*

In *McClanahan*, discussed above, the Court, in addition to discussing treaty construction, also addressed congressional approval of state taxation of American Indians and their property on a reservation:

> State laws generally are not applicable to tribal Indians on an Indian reservation except where Congress has expressly provided that State laws shall apply. It follows that Indians and Indian property on an Indian reservation are not subject to state taxation except by virtue of *express authority* conferred upon the State by *act of Congress.*

*411 U.S. at 170-71* (internal quotation marks and [**41] citation omitted) (emphasis supplied).

In *Yakima*, the Supreme Court addressed congressional approval of state taxation of reservation land held by American Indians under the Dawes Act and the Burke Act of 1906, *34 Stat. 182.* The Dawes Act, passed in 1887, "empowered the President to allot most tribal lands nationwide without the consent of the Indian nations involved." *502 U.S. at 254.* As explained, *supra,* Section 5 of the Dawes Act required that each allotted [*529] parcel be held in trust by the United States for twenty-five years, after which the parcel would be free

from restrictions on alienation. *Id.* Section 6 of the Dawes Act stated that each individual who was the recipient of an allotment had the benefit of and was subject to the laws of state in which he resided. *Id.*

[***14] In 1905, in the case of *In re Heff, 197 U.S. 488, 25 S. Ct. 506, 49 L. Ed. 848 (1905),* the Supreme Court held that Section 6 of the Dawes Act created plenary state jurisdiction immediately upon the issuance of the allotment, as opposed to the expiration of the twenty-five year trust period. *Id. at 255.* In response, Congress enacted the Burke Act, which stated that state [**42] jurisdiction would lie after the expiration of the twenty-five year trust period. *Id.* The Burke Act also contained a proviso that allowed the President to issue a patent in fee simple prior to the expiration of the trust period if the President found the allottee to be competent and able to manage her own affairs. *Id.* "Upon such a premature patenting," the Burke Act stated that "all restrictions as to sale, incumbrance, or taxation of said land" were to be removed. *Id.* (quoting *34 Stat. 183*) (internal quotation marks omitted).

The *Yakima* plaintiff was an American Indian tribe, who, along with its members, held in fee simple lands that were allotted under the Dawes Act and the Burke Act. *Id. at 256.* The plaintiff filed an action in district court seeking a declaratory judgment that such lands were exempt from state *ad valorem* taxation. The Supreme Court disagreed and found that the lands were subject to the state real property tax. The Court first noted that "the power to tax involves the power to destroy," as observed by Chief Justice Marshall in *McCulloch v. Maryland, 17 U.S. (4 Wheat.) 316, 431, 4 L. Ed. 579 (1819). Id. at 258.* As such, [**43]

> [a]bsent cession of jurisdiction, or other federal statutes permitting it, we have held, a State is without power to tax reservation lands and reservation Indians. . . . And our cases reveal a consistent practice of declining to find that Congress has authorized state taxation unless it has made its intention to do so unmistakably clear.

*Id.* (internal quotation marks and citations omitted). The Court found such clear congressional intent in Section 5 of the Dawes Act, where Congress allowed lands allotted under the Dawes Act to be free of restrictions on alienation after the elapse of the trust period. *Id. at 263.* "[W]hen § 5 rendered the allotted lands alienable and encumberable, it also rendered them subject to assessment and forced sale for taxes." *Id. at 263-64.* The Court also found that the Burke Act represented a clear intention by Congress that the allotted land be

---

[3] This legislation effectively cut short the time frame in which the Puyallup Indians could not sell their allotted lands. Under the Dawes Act, the allottee would have to wait twenty-five years after the allotment to be free from restrictions on alienation, whereas under the 1893 legislation, the allottee would have to wait only until 1903.

452 F.3d 514, *529; 2006 U.S. App. LEXIS 15993, **43; 2006 FED App. 0207P (6th Cir.), ***14

subject to taxation after the trust period, as that was made explicit in the proviso allowing the President to remove restrictions prior to the lapse of twenty-five years. *Id. at 264*.

In *Cass County v. Leech Lake Band of Chippewa Indians, 524 U.S. 103, 118 S. Ct. 1904, 141 L. Ed. 2d 90 (1998)*, [**44] the Supreme Court examined the allotment of land under the Nelson Act of 1889. The Nelson Act distributed reservation land in three different ways. *Id. at 108*. Under Section 3, the United States allotted parcels to individual tribe members as provided for under the Dawes Act. *Id.* Under Sections 4 and 5, the United States sold "pine lands" to the highest bidder. *Id.* Under Section 6, the United States sold the remainder of the reservation land to non-Indian settlers. *Id.* The plaintiff American Indian band had purchased lands distributed under Sections 4, 5, and 6 to reestablish its land base. *Id.* The state [*530] taxation of these lands was before the Supreme Court. *Id. at 110*.

The Court found that the lands were subject to state taxation. Echoing its analysis in *Yakima*, the Court stated that "when Congress makes reservation lands freely alienable, it is 'unmistakably clear' that Congress intends that land to be taxable by state and local governments, unless a contrary intent is 'clearly manifested.'" *Id. at 113* (quoting *Yakima, 502 U.S. at 263*). The Court held that the Nelson Act provided for the public [**45] sale of the lands in question, so Congress made those lands freely alienable; as a result, those lands were also subject to taxation. *Id.* The Court rejected the plaintiff's argument that when the plaintiff reacquired the lands, the lands became nontaxable. *Id. at 114*. The Court found that once Congress expressed a clear intent to make the land taxable, Congress must then express a clear intent to make the land nontaxable. *Id.* Moreover, the Court found that the plaintiff's position would render superfluous a federal statute that allowed the federal government to hold reservation lands in trust so that such land would be nontaxable; Congress had already provided an explicit route for the plaintiff to seek shelter from state taxation. *Id.*

[***15] **b. Application to This Case**

**i. The 1854 Treaty**

The Indian sovereignty doctrine serves as a backdrop not only for treaty interpretation but also statutory interpretation as well:

> The Indian sovereignty doctrine is relevant, then,

not because it provides a definitive resolution of the issues in this suit, but because it provides *a backdrop against which the applicable treaties and federal statutes must be* [**46] *read*. It must always be remembered that the various Indian tribes were once independent and sovereign nations, and that their claim to sovereignty long predates that of our own Government.

*McClanahan, 411 U.S. at 172* (emphasis supplied). This backdrop reinforces the requirement that Congress must make its intent to allow state taxation of reservation lands "unmistakably clear." *Yakima, 502 U.S. at 258* (internal quotation marks and citation omitted). Specifically, "[a]bsent cession of jurisdiction, or other *federal statutes* permitting it, we have held, a State is without power to tax reservation lands and reservation Indians." *Id.* (internal quotation marks and citation omitted) (emphasis supplied). In *McClanahan*, the Court stated: "Indians and Indian property on an Indian reservation are not subject to state taxation except by virtue of *express authority* conferred upon the State by *act of Congress* ." *411 U.S. at 171* (internal quotation marks and citation omitted) (emphasis supplied).

Defendants argue that the 1854 Treaty is sufficient to demonstrate the clear congressional intent necessary to allow state [**47] taxation of reservation lands. We disagree. A treaty is not a federal statute or an act of Congress. In our view, Congress makes its intent to allow state taxation of reservation lands unmistakably clear when it passes a statute to that effect. It is no coincidence that the Supreme Court used phrases such as "federal statutes" and "act of Congress" in describing what would be necessary for the Court to deem state taxation of reservation lands permissible. A treaty simply does not embody this clear congressional intent, as a treaty's ratification only involves the Senate, and thus does not have the same bicameral hurdles of an act of Congress. Defendants argue [*531] that because a treaty, under United States law, is self-executing and is the law of the land, it is the equivalent of an act of the legislature. We agree that the *effect* of a treaty has legal import, as does the effect of an act of legislation; however, the mere fact that a treaty has legal force does not mean it is an act of Congress. All of the cases to which Defendants cite stand only for the proposition that, under United States law, a treaty is self-executing and does not require additional legislation to take effect. [**48] *See, e.g., Foster v. Neilson, 27 U.S. 253, 314, 7 L. Ed. 415 (1829), overruled on other grounds by United States v. Percheman, 32 U.S. 51, 8 L. Ed. 604 (1833)*.

452 F.3d 514, *531; 2006 U.S. App. LEXIS 15993, **48; 2006 FED App. 0207P (6th Cir.), ***15

While this is true, this does not mean a treaty is in fact an act of Congress representing that body's will. Concededly, legal authority may be derived from sources other than Congress, but the fact that a treaty has certain legal import is insufficient to establish that a treaty is an act of Congress that represents its will.

Defendants cite two cases of sister circuits where those courts found certain allotted lands, made alienable through treaty, to be taxable by the state. Neither of those cases, however, stand for the proposition that a treaty represents the clear intent of Congress. In *Lummi Indian Tribe v. Whatcom County, 5 F.3d 1355 (9th Cir. 1993)*, the Ninth Circuit relied solely on the alienable character of the allotted land to find that such land was taxable. Indeed, the Ninth Circuit recognized that a treaty did *not* represent clear congressional intent:

> The logic propounded by the *Goudy* Court and approved by *Yakima Nation* requires an Indian, [**49] even though he receives his property by treaty, to accept the burdens as well as the benefits of land ownership. *This proposition may be hard to square with [***16] the requirement, recently approved by the* Yakima Nation *Court, that Congress' intent to authorize state taxation of Indians must be unmistakably clear.* The strength of the language in *Yakima Nation*, however, makes virtually inescapable the conclusion that the Lummi land is taxable if it is alienable.

*Id. at 1358* (emphasis supplied). Thus, the Ninth Circuit rested its analysis on the notion that alienability equals taxability, regardless of the source of that alienability; it explicitly found that a treaty was not an expression of clear congressional intent. [4]

[**50] Likewise, *Thompson v. County of Franklin, 314*

---

[4] We disagree with the holding of the *Lummi* decision. No Supreme Court case has stated that alienability equals taxability. As noted by the *Lummi* dissent, "[t]he Supreme Court in *Yakima Indian Nation* did not ignore how the land was allotted; the method of land allotment is crucial in federal Indian law." *Id. at 1360* (Beezer, J., dissenting). Indeed, in *Cass County*, the dissent in the court of appeals opinion was of the view that "alienability allows taxation." *524 U.S. at 110* (internal quotation marks and citation omitted). Despite the fact that this argument was before the Supreme Court, the Court did not base its decision on this ground; instead, the Court reaffirmed the principle that *Congress* must make clear its intent to allow state taxation of reservation lands, and it had done so with the Nelson Act. *Id. at 113.*

*F.3d 79 (2d Cir. 2002)*, does not stand for the proposition that a treaty represents clear congressional intent. In that case, the lead opinion (there was no majority opinion) found that the land in question was freely alienable, although it did not explain from where this alienability derived. The lead opinion then found clear congressional intent to make the land alienable under the Indian Nonintercourse Act of 1790, ("INA"), *25 U.S.C. § 177*. *Id. at 82.* The INA states: "No purchase, [*532] grant, lease, or other conveyance of lands, or of any title or claim thereto, from any Indian nation or tribe of Indians, shall be of any validity in law or equity, unless the same be made by treaty or convention entered into pursuant to the Constitution." The lead opinion found that the INA also stood for the fact that a conveyance made by treaty was valid, such that any property properly conveyed would also be subject to taxation. [5] *Id. at 82-83.* Nowhere in the lead opinion, or any of the opinions, for that matter, did the court assert that a treaty is an expression of clear [**51] congressional intent.

[**52] The 1854 Treaty is not sufficient to demonstrate a clear congressional intent that the lands at issue in this case be alienable and thus taxable.

## ii. The Statutes

---

[5] We also disagree with the analysis of the lead opinion. The INA differs from the other statutes that the Supreme Court has validated as expressing the clear congressional intent of alienability, in that the INA is not the source of the alienable character of the property. For example, under the Nelson Act, the alienability of the lands at issue derived from the Nelson Act itself, because the Act provided for the public sale of certain lands. As the dissent viewed the situation, "the issue seems to me not whether Thompson's land is freely alienable, but whether it is freely alienable *because* of an act of Congress." *Id. at 95* (Sack, dissenting) (emphasis supplied). Suppose, for example, that a treaty empowered the President to allot reservation lands without restrictions on alienation. In such a case, an allotment would be freely alienable not because of an act of Congress, but because of the act of the President as empowered by the treaty. The mere fact that the conveyance of such an allotment would pass muster under the INA does not answer the question of whether Congress has made clear its intent that the land be alienable. A key point is that the INA speaks to the conveyance of property, whereas statutes such as the Dawes Act and the Nelson Act speak to the nature of property. In short, congressional approval of the conveyance of alienable property does not necessarily evidence a clear congressional intent that such property be alienable in the first place.

452 F.3d 514, *532; 2006 U.S. App. LEXIS 15993, **52; 2006 FED App. 0207P (6th Cir.), ***16

Defendants argue that certain statutes demonstrate a clear congressional intent that the lands at issue in this case be alienable. We categorically disagree. Defendants first assert that the 1854 Act, 10 Stat. 598, evidences such clear congressional intent. The 1854 Act authorized the President to negotiate with the Chippewa Indians with respect to certain lands in Minnesota and Wisconsin. Defendants did not raise this argument before the district court, so they may not raise this argument before this Court. Preferred RX, Inc. v. American Prescription Plan, Inc., 46 F.3d 535, 549 (6th Cir. [***17] 1995) ("[T]his court will not consider issues not presented to the district court but raised for the first time on appeal."). In fact, Defendants argued in district court that the 1854 Act was inapplicable to the case at hand. Defendants cannot now reverse course and assert the 1854 Act is applicable to this case.

Defendants next rely on the Dawes Act to show a clear congressional intent that the [**53] lands at issue be alienable. The record, however, contains absolutely no evidence that L'Anse reservation land was ever allotted under the Dawes Act. Indeed, although all three experts, Cleland, Gulig, and Greenwald, agreed that reservation land was allotted pursuant to the 1854 Treaty, none of the experts claimed that reservation land was allotted pursuant to any other law. Greenwald opined that the Office of Indian Affairs allotted land under the 1854 Treaty utilizing the same procedures as the Dawes Act, but Greenwald never claimed that the Dawes Act ever supplanted the 1854 Treaty as the source of power from which the allotments derived. Likewise, Defendants' reliance on certain acts passed in 1910 and 1913 is misplaced. Those acts, 36 Stat. 855 and 37 Stat. 678, [*533] provided that if an allottee died before the trust period expired, the Secretary of the Interior could issue the land in fee simple to the heirs if he found the heirs to be competent. We agree that lands so issued would be taxable, as Congress clearly expressed its intent that such lands were to be held in fee simple and thus would be alienable. The problem, however, is that Defendants muster not even a scintilla of evidence [**54] demonstrating that any of the land at issue was indeed issued under either of the acts. In fact, it was impossible for any of the land at issue to have been issued under the 1913 Act, at the least, because Defendant's own expert found that all of the land on the L'Anse reservation had been allotted by 1912.

Defendant's reliance on an act passed in 1922, 42 Stat. 994, is similarly flawed. That act provided that the Secretary of the Interior could allot reservation lands under treaties where the President had such power. In other words, the act made clear that the Secretary of the Interior could exercise presidential power with respect to allotments under treaties. We first note that land within the L'Anse reservation could not have been allotted under the 1922 Act, as all of the land within the reservation had already been allotted by 1912. This fact is dispositive of this argument. Furthermore, we agree with the district court that the 1922 Act was not so much congressional approval of alienability of lands allotted by the Secretary of Interior so much as it was a clarification as to the delegation of the President's power: "[T]he statute appears to be more of an 'administrative [**55] housekeeping measure,' than an act that was intended to abrogate or change the rights under the 1854 Treaty or address the alienability of such land." (J.A. at 639.)

The record demonstrates that the lands within the L'Anse reservation were allotted pursuant to the 1854 Treaty and not the Dawes Act, the 1854 Act, the 1910 Act, the 1913 Act, nor the 1922 Act. Defendants failed to demonstrate a clear congressional intent that the lands allotted on the L'Anse reservation be alienable and thus taxable.

We realize that the case turns on the formality of whether land was allotted and made alienable through an act of Congress or through some other source, such as the President. Supreme Court jurisprudence makes clear, however, that only Congress has the power to authorize state taxation of American Indian reservation land. If land becomes alienable through the clear intent of Congress, as manifested by statute, such land is also taxable. If land becomes alienable through another source, Congress simply has not spoken as to whether that land should be taxable.

### III. CONCLUSION

For the foregoing reasons, we AFFIRM the order of the district court.

Dissent by: RALPH B. GUY, JR.

# Dissent

[***18] [**56] RALPH B. GUY, JR., dissenting. The court has accurately set forth the facts and procedural history of this case. The result reached is certainly plausible. Nonetheless, I believe the approach taken by the Ninth Circuit in Lummi Indian Tribe v. Whatcom County, Washington, 5 F.3d 1355 (9th Cir. 1993), is the

452 F.3d 514, *533; 2006 U.S. App. LEXIS 15993, **56; 2006 FED App. 0207P (6th Cir.), ***18

better one. In *Lummi* the court held:

> A state cannot tax reservation lands or reservation Indians unless Congress has "made its intention to [authorize state taxation] unmistakably clear." [*County of Yakima v. Confederated Tribes and Bands of the Yakima Indian Nation, 502 U.S. 251, 258, 116 L. Ed. 2d 687 (1992)*, 112 S. Ct. 683 at 688 (quoting *Montana v. Blackfeet Tribe, 471 U.S. 759, 765, 105 S. Ct. 2399, 2402, 85 L. Ed. 2d 753 (1985)*]. In *Yakima [*534] Nation*, the Court found an unmistakably clear intent to tax fee-patented land. It did not rely on section 6 of the General Allotment Act as Yakima County proposed, concluding instead that the land's alienable status determines its taxability. See *[Yakima ] at [257-265], 112 S. Ct.* at 688-691. The Court made no distinction between fee land allotted [**57] by treaty and that allotted under the Act. Its interpretation of section 5 of the Act and the proviso to section 6 imply that no matter how the land became patented, it is taxable once restraints against alienation expire.

*Id. at 1357* (first alteration in original) (footnote omitted).

The court went on to say:

> The logic propounded by the *Goudy* Court [*Goudy v. Meath, 203 U.S. 146, 27 S. Ct. 48, 51 L. Ed. 130 (1906)*] and approved by *Yakima Nation* requires an Indian, even though he receives his property by treaty, to accept the burdens as well as the benefits of land ownership. This proposition may be hard to square with the requirement, recently approved by the *Yakima Nation* Court, that Congress' intent to authorize state taxation of Indians must be unmistakably clear. The strength of the language in *Yakima Nation*, however, makes virtually inescapable the conclusion that the Lummi land is taxable if it is alienable.

*Id. at 1358.*

There was a dissent in *Lummi* and the dissenting judge stated: "There is an appealing simplicity to the proposition that alienable land is taxable land. Unfortunately, federal Indian law does not have [**58] a simple history; no amount of wishing will give it a simple future." *Id . at 1360.* I have no quarrel with this observation, but I cannot find in the Treaty anything from which I can reasonably conclude that once this land became freely alienable, it should escape taxation.

Without meaning to demean in any way the credentials of the experts who testified, I do not believe that any expert can tell you what was in the mind of an Indian 150 years ago relative to losing his land through forfeiture for nonpayment of taxes, when the tribe knew nothing of taxation and the consequences that might flow from failure to pay taxes that were assessed. I do not find the treaty language ambiguous. For me it is clear that, in a historical context, what was referenced when "removal" was mentioned was relocation of the tribe, and it had nothing to do with what might happen when freely alienable land was under individual ownership.

---

End of Document

# EXHIBIT C

04/03/2017 13:15 IFAX faxcenter.mpl@dorsey.com                    → Fax Central      @008/015
08/18/2009 15:20  17156825921            TOM DERAGON                        PAGE  08
                                                                    ⁊  C723-2007

## RESOLUTION

WHEREAS, the Town of Sanborn is located entirely within the boundaries of the Reservation of the Bad River Band of Lake Superior Tribe of Chippewa Indians (hereinafter "Tribe") in Ashland County, Wisconsin, and,

WHEREAS, pursuant to the 1854 Treaty between the United States Government and the Chippewas lands were allotted in fee simple within the boundaries of the reservation and the Town of Sanborn to the Tribe and its members, and,

WHEREAS, the United States Federal Courts have determined that the lands allotted in fee simple pursuant to the 1854 treaty which lands are owned by the Tribe or Tribe members are not subject to State real estate tax laws and are, therefore, not subject to real estate taxation pursuant to the U.S. Court of Appeals for the Six Circuit Court case of Keweenaw Bay Indian Community v. Naftaly et al and Township of L'Anse et al, 452 F. 3d 514, 2006 Fed. App. 0207P, cert. denied by 127S. CT. 680, 166 L. Ed. 2d 516, 75 U.S.L.W. 3177, 75 U.S.L.W. 3280, 75 U.S.L.W. 3283 (November 27, 2006), and,

NOW, WHEREAS, the Town of Sanborn is obliged to comply with the Federal Court holdings in the above referenced case,

THEREFORE, the Town Board of the Town of Sanborn resolves as follows:

1.  The Town of Sanborn acknowledges the holding of the above referenced case.

2.  The Town of Sanborn and its assessor shall list on its tax roll as "non-taxable" any land allotted in fee simple pursuant to the 1854 treaty owned by the Tribe or any Tribe member.

Dated: _7/23/2007_

APPROVED

Luis Salas, Town Chairman

Frank Connors, Sr., Supervisor

ATTEST:

Jamie Weaver, Town Clerk

Robert Blanchard, Supervisor

Page 7

# EXHIBIT D



## State of Wisconsin ● DEPARTMENT OF REVENUE

DIVISION OF STATE AND LOCAL FINANCE ● BUREAU OF ASSESSMENT PRACTICES ● MADISON, WI

ADDRESS MAIL TO:

Area 6-97
2135 Rimrock Road ● P.O. Box 8971
Madison, WI 53708-8971
TELEPHONE: (608) 261-5360
FAX: (608) 287-0835

April 4, 2007

Mr. Martin Meyer
P.O. Box 306
Ashland, WI 54806

Dear Mr. Meyer:

This letter provides information regarding determination of the taxability of Native American owned fee simple land that is located on the reservation.

The U.S. Court of Appeals for the Sixth Circuit recently ruled in a Michigan case (*Keweenaw Bay Indian Community v. Naftaly*), that certain Native-American owned fee simple land on Ojibwe (Chippewa) reservations is not taxable, because the 1854 Treaty of LaPointe with the Ojibwe does not permit taxation of such lands. The Treaty provides that "the Indians shall not be required to remove from the homes hereby set apart for them." Sec. 11. This precludes states from enforcing property tax, since the land could not be sold to pay the tax.

The Keweenaw Bay court decision does not directly apply to Wisconsin; however its precedent and reasoning are consistent with a prior Wisconsin Attorney General opinion and the Wisconsin Property Assessment Manual (WPAM). Four reservations in Wisconsin may contain land granted by the same 1854 treaty: Bad River (then known as the LaPointe band), Red Cliff (a subdivision of the LaPointe band headed by the renowned Chief Buffalo), Lac Du Flambeau and Lac Courte des Oreilles.

"Native American owned real property on an Indian reservation is not subject to state and local taxation unless an Act of Congress provides for it. In the situation where a Native American owns real property on a reservation in fee simple it is subject to the property tax on the presumption that the Congressional act authorizing fee simple ownership provides for taxation of the land." WPAM 2007 Volume 21.7-22, Revenue Department Policy on Native American Property Tax Status (1993).

The Congressional Act which provides that most fee simple Native American land is taxable is the General Allotment Act of 1887. Land allotted pursuant to that Act (and many later Congressional acts) is taxable.

However, some land allotted before 1887, such as that allotted to Ojibwe tribal members under the 1854 treaty, may be exempt. The Wisconsin Attorney General explained this in 1983:

> I believe the state and its local subdivisions have express authority pursuant to the general allotment act of 1887, as amended, 25 U.S.C. ss 331 et seq., particularly 25 U.S.C. ss349, to impose property taxes on fee patented Indian lands located within the exterior boundaries of the reservation which were first allotted pursuant to the act after February 8, 1887. The allotment act does not apply, however, to Indian fee patented lands allotted prior to that date directly under the treaty with the Chippewas of September 30, 1854 and, accordingly, such lands are not

Mr. Martin Meyer
April 4, 2007
Page Two


72 Op.Atty.Gen. 74 (1983).

With regard to land owned by Native Americans that is covered by the 1854 treaty, there is no presumption of taxability in these instances and the burden to prove taxability rests with the municipality. The municipality would be required to determine whether:

   (1)  the fee simple parcel is within the outer boundary of the reservation, and
   (2)  the parcel was subject to the 1854 treaty.

In this situation the exempt status of reservation land is the result of federal treaties rather than a State statutory exemption. The State does not have authority to tax property that is exempt via federal guidelines unless it is authorized to do so by Congress, so the typical statutorily required documents and exemption requests are not applicable to this type of property.

The level and types of documentation needed to verify whether a particular fee simple parcel was allotted by a particular treaty may vary, but should include the treaty itself at minimum, and may include other historical records. We enclose a copy of the treaty for your information.

I hope this information is of assistance. If questions arise that are beyond the scope of the WPAM, this letter, or the role of the assessor, the municipality should consult appropriate legal counsel.

Sincerely,

*Billy Bowers*

Billy J. Bowers, Director
Bureau of Assessment Practices
Wisconsin Department of Revenue


cc:   Al Romportl
      Dan Davis
      Scott Shields

# EXHIBIT E

04/03/2017 13:15 IFAX faxcenter.mpl@dorsey.com                    → Fax Central        ☑010/015
08/18/2009  15:20    17156825921              TOM DERAGON                          PAGE  10



## State of Wisconsin ● DEPARTMENT OF REVENUE

DIVISION OF STATE AND LOCAL FINANCE ● ● MADISON, WI

ADDRESS MAIL TO:

Area 8-97
2135 Rimrock Road ● P.O. Box 8971
Madison, WI 53708-8071
TELEPHONE: (608) 266-0939
FAX: (608) 287-0635

August 29, 2007

RECEIVED
SEP - 6 2007
BAD RIVER TRIBAL OFFICE

Mr. Eugene Bigboy, Sr., Chairman
Bad River Band of Lake Superior Chippewa Indians
P.O. Box 39
Odanah, WI 54861

Dear Chairman Bigboy,

Roger Ervin, The Secretary of the Wisconsin Department of Revenue has asked me to forward you copies of our recent correspondence regarding the taxation of Native American land on the Reservation. I have enclosed two letters that were written in response to inquires from local assessors and other local officials after the recent Sixth Circuit Court of Appeals case, *Keweenaw Bay Indian community v. Naftaly.*

I hope this information is of assistance to you. If you have further questions that are beyond the scope of the documents included please contact me at 608-266-0939.

Sincerely,

Daniel F. Elsass, Administrator,
Division of State and Local Finance
Wisconsin Department of Revenue

Enclosure

Page 9



**State of Wisconsin • DEPARTMENT OF REVENUE**

DIVISION OF STATE AND LOCAL FINANCE • MADISON, W

ADDRESS MAIL TO

Area 6-97
2135 Rimrock Road • P.O. Box 8971
Madison, WI 53708-8971
TELEPHONE: (608) 266-0935
FAX: (608) 264-6883

August 24, 2007

To:   Local Assessors of Fee Lands Owned by Native Americans in Reservations in
      Ashland, Bayfield, Iron, Sawyer, Washburn, Burnett and Vilas Counties

Re:   Native American Owned Fee Land Located on the Reservation

This letter is in response to several inquiries the Department of Revenue received from local
assessors regarding the procedures for dealing with fee lands owned by Native Americans on
reservations affected by the Treaty of 1854 ("affected property"), because of inquiries triggered by
the recent Sixth Circuit Court of Appeals case, *Keweenaw Bay Indian Community v. Naftaly*. The
questions as I understand them and my responses to them are as follows:

(1) **Verification of property ownership.** Native American tribes have provided lists of members
and properties owned by those members in order to obtain a property tax exemption. What are the
Department's guidelines on verifying this information?

ANSWER: When a Native American tribe or tribal member claims a property is exempt under the
Treaty of 1854, the property is assumed to be exempt. The onus is on the municipality to challenge
this presumption and prove that the property is taxable. The municipality should contact their
attorney to identify acceptable standards and sources of verification. The federal Bureau of Indian
Affairs, appropriate Congressional representatives, title companies, and historical societies may be
helpful resources in the verification.

(2) **Property owned by business.** If an affected property is owned by business, is this property
exempt or taxable?

ANSWER: Property on a reservation is completely exempt if owned by a business that is at least
51% owned by the reservation's tribe or tribal member(s). However, when the reservation's tribe or
tribal member(s) own 50% or less of the business, the property owned by the business is taxed in
part. The Wisconsin Property Assessment Manual (WPAM), at 21.7-23, outlines how to determine
tribal ownership and pro-rate property tax where appropriate:

> For the purposes of determining Native American ownership a corporation is
> considered to be a Native American corporation and not taxable if the corporation is
> controlled and operated by Native Americans who are enrolled members of the tribe
> of the reservation on which the corporation operates. Control requires ownership of
> 51% or more of the corporation's stock. For example, a structure used for a shopping
> center constructed on land held in trust for the tribe and located on the reservation
> where the ownership of the structure is shared by a Native American (individual or
> tribe) and a non-Native American the structure would be taxed at a value equal to the
> same percent of its fair market value as the non-Native American's ownership interest

04/03/2017 13:16 IFAX faxcenter.mpl@dorsey.com        → Fax Central        ☏012/015
08/18/2009 15:20   17156825921         TOM DERAGON                   PAGE  12

Local Assessor Questions
August 24, 2007
Page Two of Three

(3) **Property owned by married couples.**  If a married couple owns affected property, and one spouse is Native American and the other is non-Native American, are these properties taxable, taxed in part, or exempt?

ANSWER:  Under Wisconsin's marital property law, property in these circumstances is completely exempt, assuming the Native American spouse is a member of the tribe on whose reservation land the property is located.

(4) **Compliance with state statutes for obtaining property tax refunds.**  Is it necessary for a Native American to follow sections 74.33 or 74.35 of the Wisconsin statutes in order to obtain a property tax refund? Should the municipality "automatically" accept the refund requests?

ANSWER:  Refund requests made by Native Americans must be made in accordance with the applicable state laws.

The municipality has the discretion to grant or deny refund requests made pursuant to sec. 74.33. Section 74.33(1) says that "the governing body of the taxation district may refund or rescind in whole or in part any general property tax shown in the tax roll."  (Emphasis added).

However, the municipality must grant requests made pursuant to sec. 74.35, if the governing body of the tax district determines:

      (a) That an unlawful tax has been paid, and
      (b) That the claim for recovery of the unlawful tax has complied with all legal requirements.

Claims under sec. 74.35 must be filed by January 31 of the year in which the tax is payable.  See sec. 74.35(5) (a).

(5) **Refund period.**  If secs. 74.33 or 74.35 apply, how many years of tax is the Town required to refund? Since the enactment of sec. 74.33 in 1987, or indefinitely, since the state never had the power to tax in the first place?

ANSWER:  The decision whether or not to refund under sec. 74.33 and for how many years is a discretionary decision made by the municipality, and should be in consultation with the appropriate municipal legal counsel.  Refunds under sec. 74.35 are generally limited to a one-year period, except as otherwise provided by sec. 74.35(5).

(6) **Managed Forest Land program.**  Another issue involves land that is enrolled in the Managed Forest Land program (MFL).  Since the state does not have the ability to tax, does that invalidate all MFL contracts?

ANSWER:  Questions regarding the Managed Forest Land program should be directed to the Department of Natural Resources, which is the agency responsible for administering the program.

(7) **Retroactivity and the *Keweenaw Bay* decision.**  Since the case was issued by a federal appellate court in favor of a Michigan tribe in 2006, should other parties only move forward from 2006, not retroactively?  What weight should be given to that decision?

Local Assessor Questions
August 24, 2007
Page Three of Three

ANSWER:  Section 74.35 does generally not permit retroactive application; sec. 74.33 does permit some retroactive application at the discretion of the municipality.  Whether or not retroactive application is appropriate should be determined by the municipality in conjunction with its attorney (assuming a claim is received under sec. 74.33).

The 2006 federal appellate court decision is not controlling in Wisconsin, but it is not the first legal guidance on this issue.  The Wisconsin Attorney General issued an opinion that reached a similar result in 1983.  72 Op. Atty. Gen. 74.  While such opinions are not binding precedent, they do carry weight.  In addition, existing guidance in the Wisconsin Property Assessment Manual (WPAM) specifies in 21.7-22 that:

> Native American owned real property on an Indian reservation is not subject to state and local taxation unless an Act of Congress provides for it. In the situation where a Native American owns real property on a reservation in fee simple it is subject to the property tax on the presumption that the Congressional Act authorizing fee simple ownership provides for taxation of the land."

The Congressional Act which provides that most fee simple Native American land is taxable is the General Allotment Act of 1887. Land allotted pursuant to that Act (and many later Congressional acts) is taxable. However, some land allotted before 1887, such as that allotted to Ojibwe tribal members under the 1854 treaty, may be exempt.

(8) Charge back.  If the Town provides a refund and subsequently requests a charge back under sec. 74.41, will the Department approve that charge back?

ANSWER:  The Department of Revenue will review any claims for a sec. 74.41 charge back when received and determine an appropriate action in accord with the state statutes. The impact of a refund on the levy or other municipal functions should not be considered by the municipality during its evaluation of a refund request and is not a determining factor for the Department.

I hope this information is of assistance. If questions arise that are beyond the scope of the WPAM, this letter, or the role of the assessor, the municipality should consult appropriate legal counsel.

Sincerely,

Daniel F. Elsass
Administrator
Division of State and Local Finance

cc:    Wendy Wink
       Carrie Templeton
       Dan Davis
       Scott Shields

# EXHIBIT F

STATE OF WISCONSIN          CIRCUIT COURT          ASHLAND COUNTY

SCOTT BRETTING
RICHARD AND LINDA MITCHELL
DARRELL KLEIN                                      Case No. 16CV30

                Plaintiffs,

vs.

TOWN OF SANBORN BOARD OF
REVIEW

                Defendant.

JAN 1 8 2017

CLERK OF CIRCUIT COURT
ASHLAND COUNTY, WISCONSIN

## ORDER FROM HEARING OF DECEMBER 7, 2016

The above-captioned matter having come before the Court for a hearing on December 7, 2016 at 10:30 a.m. regarding Plaintiffs' Petition for *Certiorari*, and the Defendant's Motion for Stay of Proceedings, and;

Plaintiffs, having appeared by their attorneys, Linda I. Coleman, of Spears, Carlson & Coleman, and Frank W. Kowalkowski, of von Briesen & Roper, s.c.; and the Defendant, by its attorney, R. Valjon Anderson, of Arenz, Molter, Macy, Riffle & Larson, S.C. and;

The Court having reviewed the pleadings herein and the Briefs submitted by the parties, and having heard oral arguments on December 7, 2016, makes the following findings and Order:

The Court makes the following findings:

1.      The Town Board of the Town of Sanborn passed Resolution No. 0723-2007, a copy of which was attached to the Complaint ("Resolution"), which stated that "[t]he Town of Sanborn and its assessor shall list on its tax roll as 'non-taxable' any land allotted in fee simple pursuant to the 1854 treaty owned by the Tribe or any Tribe member."

- 1 -

PAGE 02
☑002/015
→ Fax Central
TOM DERAGON
17156825921
04/03/2017 13:15 IFAX faxcenter.mpl@dorsey.com
08/18/2009 15:20

2.    The Wisconsin Department of Revenue ("DOR") sent written guidance to the Town and its assessor regarding the taxability of the real property impacted by the Resolution.

3.    The DOR also published guidelines in the Wisconsin Property Assessment Manual which addresses the taxability of property impacted by the Resolution.

4.    Pursuant to Wis. Stat. § 70.32(1), assessors in the state of Wisconsin are required to follow the direction of the DOR as specified in the Wisconsin Property Assessment Manual.

5.    The treating of certain properties as "non-taxable" pursuant to the Resolution is contrary to the DOR's Wisconsin Property Assessment Manual and is also contrary to the specific written guidance provided by the DOR to the Town of Sanborn and its assessor.

6.    The Town assessor, Town board, and Town Board of Review lacked the authority to determine what properties will or will not be taxed.

7.    The Town Board of Review owes a fiduciary duty to all residents of the Town of Sanborn.

8.    The Resolution has no basis in law and exceeded the Town's authority.

9.    The Town Board of Review, at the December 17, 2015 Town Board of Review hearing, or prior to that date, had reason to believe that any property that stopped being taxed due to the Resolution had been omitted.

IT IS HEREBY ORDERED:

1.    The Defendant's Motion for Stay is *DENIED*.

2.    The Plaintiffs' Petition for *Certiorari* is *GRANTED*.

3.    The Town Board of Review shall, forthwith, notify the owner, agent, or possessor of all the property that stopped being taxed in the Town of Sanborn due to the Resolution, of the

Town Board of Review's intention to place said property on the assessment roll as taxable property.

4.     In the notice provided to all property owners, agents, or possessors of property, that stopped being taxed pursuant to the Resolution, the Town Board of Review shall also include a time and place for a hearing to be heard before the Town Board of Review in relation thereto, said hearing to be scheduled forthwith, and in accordance with Wis. Stat. §70.47(10).

5.     After the hearing required by this Order, the Town Board of Review shall immediately instruct the Town of Sanborn assessor to tax all properties that stopped being taxed due to the Resolution, forthwith, unless evidence is presented at the hearing, that a specific property is exempt from taxation under the rules set forth in the 2015 Wisconsin Property Assessment Manual, which reads, in part, as follows:

> On February 8, 1887, Congress enacted the General Allotment Act which applies to all Wisconsin tribes. Under that Act, real property that an individual Native American owns on a reservation in fee simple is subject to property tax. However, due to certain language in the Treaty of 1854, real property located within the reservation boundary of Bad River, Lac Courte Oreilles, Lac du Flambeau, and Red Cliff Chippewa bans is exempt *if*:
> - It was allotted before February 8, 1887 under that Treaty.
> - It is owned in fee simple by the tribe or tribal members, *and*
> - There has been no conveyance of the land to nontribal members since it was first allotted under the 1854 Treaty. For example, if the land had been exempt under the provisions of the 1854 Treaty, but was then sold to a nontribal member, the land would lose its exemption and be subject to property tax. Even if the land was later repurchased by an 1854 Tribe, the land would remain subject to property tax.

04/03/2017 13:15 [FAX faxcenter.mpl@dorsey.com                    → Fax Central        @005/015
  08/18/2009  15:20    17156825921              TOM DERAGON                        PAGE  05

Dated this _12th_ day of _January_, 20_17_.

BY THE COURT:

Honorable John M. Yackel
Ashland County Circuit Court

- 4 -

# EXHIBIT G

**Town of Sanborn**
**P.O. Box 1021**
**Ashland, WI 54806**

To: **Thomas & Sandra Deragon**
   **54595 Johnson Rd**
   **Ashland, WI 54806**

Tax Key(s):  **022-1860-0500**

### TOWN OF SANBORN BOARD OF REVIEW
### NOTICE OF ASSESSMENT BY BOARD
### Pursuant to Court Order and §§ 70.47(6) and (10), Wis. Stat.

YOU ARE HEREBY NOTIFIED that pursuant to the Order of the Court in Ashland County Case No. 16 CV 30, dated January 12, 2017, the Board of Review is required to cause your above-referenced property to be returned to taxable status on the Town of Sanborn's tax roll. Included with this Notice is a copy of the Court's Order.

Pursuant to the Order of the Court and the above-referenced statutes, you may contest this action. In order to contest the action you must complete the enclosed "Demand for Hearing" form and return it to the Town Clerk at P. O. Box 1021, Ashland, WI 54806.

YOU ARE FURTHER NOTIFIED that the Board of Review intends to commence holding the hearings demanded by owners as follows:

|            |                                              |
|------------|----------------------------------------------|
| Location:  | Sanborn Town Hall                            |
|            | 69393 US Highway 2, Ashland, WI 54806        |
| Date:      | **Monday April 24th, 2017**                  |
| Time:      | **6:00 p.m.**                                |

Depending on the number of hearings demanded, additional hearing dates may be required. If you file a Demand for Hearing, you will be notified of your specific hearing date and time. If you contest this action, in order for your property to remain non-taxable, the Court Order requires you to present evidence at the hearing that your property: (i) was allotted before February 8, 1887, under the La Pointe 1854 Treaty between the then President of the United States and the Chippewa Indians of Lake Superior and Mississippi; (ii) is owned in fee simple by the Bad River tribe or Bad River tribal members; and (iii) has never been conveyed to nontribal members since it was first allotted under the 1854 Treaty.

Dated this 21st day of March, 2017      Town of Sanborn Board of Review

By: _Jamie Weaver_____
   Jamie Weaver, Town Clerk

*page 5*

### DEMAND FOR HEARING
### TOWN OF SANBORN BOARD OF REVIEW

OWNER NAME(S): _____

OWNER ADDRESS: _____

CITY. STATE. ZIP: _____

TAX KEY NUMBER(S): _____

I/We received the Town of Sanborn Board of Review Notice of Assessment by Board Pursuant to Court Order and §§ 70.47(6) and (10). Wis. Stat.

I/We understand that pursuant to the Order of the Court in Ashland County Case No. 16 CV 30. dated January 12, 2017. the Board of Review is required to cause my/our above-referenced property to be returned to taxable status on the Town. of Sanborn's tax roll.

I/We desire to contest this action and have completed this "Demand for Hearing" form and will return it to the Town Clerk at P. O. Box 1021. Ashland, WI 54806.

I/We understand the Board of Review intends to commence holding the hearings demanded by owners as set forth in the Notice and that. depending on the number of hearings demanded. additional hearing dates may be required. and 'that' I/we will be notified of my/our specific hearing date and time.

Finally, I/we understand that in order for my/our property to remain non-taxable, the Court Order requires me/us to present evidence at the hearing that my/our property: (i) was allotted before February 8, 1887. under the La Pointe 1854 Treaty between the then President of the United States and the Chippewa Indians of Lake Superior and Mississippi; (ii) is owned in fee simple by the Bad River tribe or Bad River tribal members: and (iii) has never been conveyed to nontribal members since it was first allotted under the 1854 Treaty.

Dated and signed this _____ day of _____. 2017

_____        _____
Owner                                                         Owner

_____        _____
Owner                                                         Owner